[PHILADELPHIA, DECEMBER, 29, 1828.]

## PHILLIPS *against* IVES.

### IN ERROR.

No wager concerning any human being, is recoverable in a Court of Justice.
Therefore, a wager, whether or not *Napoleon Bonaparte,* would, within a spe-
cified time, be removed or escape from the island of *St. Helena,* was *held* to
be illegal and void.

ERROR to the District Court for the city and county of *Phila-
delphia.*

*John Phillips,* the plaintiff in error, brought this action against
*Stephen Ives,* the defendant in error, to recover the amount of a
wager, the evidence of which was a written paper in these words:

"*May* the 14th, 1821. This day *Stephen Ives* bet one hundred
dollars to fifty dollars, with *John Phillips,* that *Napoleon Bo-
naparte,* will, at or before the expiration of two years from the
above date, be removed or escape from the island of *St. Helena.*
It is understood between the parties, that if *Bonaparte* should die
within the above period of two years, and on the island of *St. He-
lena,* Mr. *Ives* loses the bet.

(Signed,)      "<i>Stephen Ives.</i><br>"<i>John Phillips.</i>"

"This bet is made in the presence of

"<i>John F. Swift.</i>"

It was proved on the trial, that the defendant acknowledged he
had lost the wager, and a verdict was given for the plaintiff subject
to the opinion of the court. The opinion of the court was divided
on the subject. The President held, that the wager was good and
the action sustainable. One of the associate judges was of opinion,
that, under no circumstances whatever, could an action be sustained
upon a wager; and the other, that in this particular case, an action
could not be supported. A majority of the court, therefore, gave
judgment for the defendant, and the plaintiff sued out a writ of
error.

*J. Randall,* for the plaintiff in error, contended, that, in *Penn-
sylvania,* an action upon a wager, can be sustained, except in cases
in which the wager is specially prohibited by act of assembly, or
void at common law. The case before the court, he said, depend-
ed on authority, and afforded an opportunity to test the value of
the principle of *stare decisis.* The subject has been frequently be-
fore the legislature, which, though it has thought proper to forbid
wagers of certain descriptions, has left wagers at common law un-
touched. It is not the province of this court, by judicial legisla-
tion, to do that which belongs to another branch of the government.

(Phillips *v.* Ives.)

*Steele* v. *Phœnix Ins. Co.* 3 *Binn.* 313. *Weidel* v. *Roseberry*, 13 *Serg & Rawle*, 180, 181. A wager, the subject matter of which is fair, is so far from being discountenanced by courts of justice, that it is fictitiously adopted as a form of deciding the most important questions. The very substratum of a feigned issue is a supposed wager. Actions upon wagers claim a high antiquity; for, in the earliest books of entries, will be found the forms of declaring upon them. Nor, is the dignity of courts at all affected by being called upon to decide such controversies. An argument like this, is so complimentary to those to whom it is addressed, as to be received with some complacency; but, in the present instance it has no support. It would interfere with the decision of many cases, in which at first, it might not be supposed to apply. What is a voyage to a foreign port but a wager upon the state of the market? Indeed, all the speculative transactions of life are, substantially, wagers. The whole subject of the impolicy of wagers was before the legislature, when, after the decision of *Morgan* v. *Richards*, 1 *Browne's Rep.* 171, and *Smith* v. *McMaster*, 2 *Browne's Rep.* 182, in which their validity was recognized, they passed laws to prohibit betting on elections, horse races, and other species of gaming, and left the general doctrine on the subject, as it stood before. The question then arises, is a wager good at common law? No principle is better established by authority, than, that they are so, when they do not interfere with good morals, or with the provisions or policy of the law. The lawfulness of wagers was recognized as long ago as 44th *Elizabeth*. In *Walcot* v. *Tappin*, 1 *Keb.* 56, 65, *S. C.* 1 *Lev.* 33, the action was upon a promise, that in consideration of twenty shillings, the defendant would give twenty pounds if *Charles Stuart* should be King of *England* within a twelve-month. The King was in exile when the bet was made, which was about six months before his restoration. The defence was put solely on the ground of want of consideration, because the subject of it was, in contemplation of law, King of *England* at the time of the contract. No objection was taken, either to the legality of wagers generally, or to the particular one in question; and, notwithstanding it was upon a political subject of deep interest to the nation, the plaintiff had judgment. The same objection, want of consideration, and no other, was taken in the case of *The Earl of March* v. *Pigot*, 5 *Burr.* 2802, in which the plaintiff and defendant agreed, at *Newmarket*, after dinner, to run the life of Sir *William Codrington*, against that of Mr. *Pigot's* father. The latter died at two o'clock in the morning of the very day on which the bet was made; but this fact was not known to the parties, and the defence was, that, as the defendant could not possibly win, he ought not to lose. The plaintiff had a verdict; and a rule to show cause why there should not be a new trial, having been granted, it was, after argument, discharged by the unanimous opinion of the court. A wager, whether a decree of the Court of Chancery would

(Phillips *v.* Ives.)

be reversed or not, on appeal to the House of Lords, it was determined in *Jones* v. *Randall, Cowp.* 37, might be recovered, unless the motive be fraud, or other *turpis causa.* In *Harrison's Digest, Title Gaming, Subdivision Wagers,* the cases are brought together, and it will be found, that though the judges have sometimes expressed doubts as to its propriety, yet the validity of wagers, in general, is uniformly treated, established legal doctrine. In *New York,* it has been fully considered and recognized. *Bunn* v. *Riker,* 4 *Johns.* 436. *Campbell* v. *Richardson,* 10 *Johns.* 406. The validity of wagers, unless they be illegal, immoral, or indecent, has been fully admitted, too, in *Pennsylvania,* by a judge, whose strict moral sense would have led him to a different result, if he had not considered the law too well settled to be called in question. *Morgan* v. *Richards,* 1 *Browne's Rep.* 171. *Smith* v. *M'Masters,* 2 *Browne's Rep.* 182. The subject matter of the present wager, between two *American* citizens, was perfectly harmless. It offended against neither law nor morals. It was a mere matter of speculation, interesting, it is true, throughout the civilized world, from the character of the extraordinary person to whom it related, but, in a national point of view, wholly immaterial. It could afect neither the life nor the security of the great state prisoner, had he been alive. Both were effectually protected by the great precautions taken by the *British* government. But, in fact, when the bet was made, he was actually dead, a fact well known as a matter of history.

*P. A. Browne,* for the defendant in error.—This case presents a peculiarly fit occasion for this court to determine, whether contracts, which every one admits to be immoral in their nature, and pernicious in their consequences, are good in law. It cannot, it is true, be maintained, that no wager, of any description, is valid, but, it may be contended—

1. That, by the common law of *Pennsylvania,* no wager is recoverable in which the parties have no other interest in the subject matter, than that which they themselves create by the wager. This position is an answer to the argument derived from the adoption of a fictitious wager, in feigned issues, in which there is always a stipulation, that the wager itself shall not be recovered. Even the use of such a form has been regretted by a learned judge of this court. *Brack. Law Misc.* 211. Among other sources of the common law of *Pennsylvania,* we are to look to the decisions of the courts of *England* prior to the revolution, and it may be safely affirmed, that there is no *English* case, prior to the 4th of *July,* 1776, in which it has been decided, *upon the point being made,* that a wager upon an indifferent subject might be recovered. This court is, therefore, entirely unfettered by transatlantic authority; the decisions subsequent to the revolution not being binding. The earliest case is that of *The Monopolies,* 11 *Coke,* 84, in 44*th Elizabeth,* cited on the other side; in which the question was, whether the Queen's grant of a

(Phillips *v.* Ives.)

monopoly for the making and importation of playing cards, was void; and the only part of the case which has any bearing upon the present question, is that in which it is said, that playing cards and dice is not prohibited by the common law. In the case reported under different names, in 1 *Keb.* 56, 65, and 1 *Lev.* 3, upon the wager, whether *Charles Stuart* would be king within a certain period, no point was made, whether a mere idle wager was good, which was taken for granted. It was not noticed either by the counsel or the court. It is, at most, therefore, a mere negative precedent, and no decision. In *Danvers* v. *Thistlethwait, Sid.* 394, and *St. Leger* v. *Pope,* 4 *Mod.* 406, 409. 5 *Mod.* 1, 4, the question was, whether the particular bet was within the statute against gaming. Neither in this, nor in any of the other cases decided before the *American* Revolution, was the general question ever raised. Since the revolution, the broad question, it is true, has been decided; never, however, without expressions of regret, that the law was, as it was believed to be, and in opposition, too, to the opinions of many distinguished judges. This court then, not being bound down by authority, are at liberty to recur to first principles, as the foundation of their decision. In the two cases cited from 1 and 2 *Browne's Rep.,* the point was not made. If it had been, from the character of the presiding judge, it cannot be doubted, that his decision would have been against the legality of an idle bet. The decisions in *New York* cannot inform us as to the common law of *Pennsylvania,* which consists of what our fathers brought with them from *England,* and of what has been since established, as applicable to the condition of a moral and religious people. In a republican government particularly, whose very foundation is purity of morals, it is against principle and against morality, to give a legal sanctity to gaming. In *England,* where the policy is to preserve great hereditary wealth in particular families, the objection to it is not so strong as in a country, the policy of which is to keep the people as nearly on a level with each other as possible, and to promote habits of industry, which are invaded by nothing so much as the spirit of gaming. We are not without example in this matter. The act of Parliament against wagering policies does not extend to this country; yet it has been expressly decided that such policies are void in *Pennsylvania,* because they are against principle. *Pritchet* v. *Ins. Co.* of *North America,* 3 *Yeates,* 458. This court upon principle, and without authority to guide them, decided in *The Commonwealth* v. *Sharpless,* 2 *Serg. & Rawle,* 91, that the private exhibition of an indecent picture, was an indictable offence. The broad principle, that good morals were part of the law of the land, was the only foundation of the decision; and surely gaming is more pernicious in its effects upon society, than the exhibition of a picture, however indecent.

Besides, the *English* decisions referred to, are merely decisions of courts of law; for equity not only uniformly refuses to lend its

(Phillips *v.* Ives.)

aid to carry into effect a gaming contract, but sometimes even gives its assistance to recover back money won at play. *Sir Basil Firbrace* v. *Brett*, 2 *Vern.* 70. 1 *Fonb.* 336. 2 *Vern.* 291. 14 *Vin. Ab. Gaming, D.* We have the full benefit of these authorities, because equity is part of the law of *Pennsylvania.*

2. The present wager is prohibited by the statute law of *Pennsylvania.* The language of the act of the 27th of *April*, 1794, sect. 8, *Purd. Dig.* 318, prohibits this species of gaming. It comes within the words, "any play whatsoever." If authority were wanting to show that betting is gaming, we have it. *Harrison*, in his *Digest*, cited on the opposite side, classes betting under the head of gaming.

3. The wager is void, because it interferes with the feelings and interests of a third person. *Cowp.* 37. It made it the interest of one of the parties that *Napoleon* should die within a limited time. The smallness of the bet, the character of the individual to whom it referred, and the improbability that any one would go to *St. Helena* to destroy him, are not material. The principle is available, no matter how remote the probability of the event to which it refers. A plausible ground is always sufficient to induce the court to refuse to carry into effect an immoral contract.

4. *Napoleon* was a state prisoner, and no matter how unjust his detention might have been, the policy and the duty of our government forbade an interference on its part, or a permission to its citizens to interfere with his concerns. The agreement between the parties to this suit, was an encouragement to do an act, which might involve the *United States* in a war with the powers of *Europe.* It is no argument to urge the insufficiency of the motive, the improbability of the attempt, or the difficulty of its execution. If such an attempt had been barely possible, that would have been enough. But it is well known, that many schemes, some of them deeply laid, and well arranged, were formed to carry off *Napoleon* from his prison, which were not carried into effect, merely because they had not his sanction.

5. The court below had not jurisdiction of the case. The wager was one hundred dollars, and the declaration demands that sum. The District Court has jurisdiction only where the sum in controversy exceeds one hundred dollars. If the principal sum is below the jurisdiction of the court, interest accruing since the commencement of the suit, cannot extend the jurisdiction.

*In reply,* it was observed, that the argument of the defendant in error, was exclusively founded on an allegation of his own turpitude, and, therefore, it ought not to avail him. The doctrine contended for, would tend to deprive every underwriter of his premium, as that is the only interest he has in the policy, which is, in effect, a wager. There is no decision or even *dictum* to support the position, that a wager on an indifferent subject cannot be recovered. The only reason why the point has not been

(Phillips *v.* Ives.)

made is, that no doubt was entertained on the subject. The argument as to the demoralizing effects of betting, is fanciful. Lotteries, which are authorized by law, are much more destructive of morals, and the peace of families. The act of 1794, relates entirely to games of address and not to wagers. As to the case cited from 3 *Yeates*, 458, on the subject of wager policies, it may be said, that it is by no means settled law in *Pennsylvania*, that such policies are illegal. The present wager could not interfere with the feelings of *Napoleon*, who was too remote, in every sense of the word, to be affected by it. If the bet leads to an inquiry into the sex or affairs of an individual, it is unlawful, but not otherwise. It's being a wager on the life of *Napoleon*, does not affect its validity. That was the character of the bet in *March* v. *Pigot*, which was held to be recoverable.

The District Court had jurisdiction. There were two counts, each upon distinct wagers of one hundred dollars. The damages were laid at one hundred and fifty dollars, and the verdict was for one hundred and twenty dollars, the judge having instructed the jury that the plaintiff was entitled to interest from the time of demand.

The opinion of the court was delivered by

HUSTON, J.—This was an action brought on a wager, evidenced by a writing in the words following:

"*May* the 14th, 1821. This day *Stephen Ives* bet one hundred dollars to fifty dollars, with *John Phillips*, that *Napoleon Bonaparte* will, at or before the expiration of two years from the above date, be removed or escape from the island of *St. Helena*. It is understood between the parties, that if *Bonaparte* should die within the above period of two years, and on the island of *St. Helena*, that Mr. *Ives* loses the bet."

(Signed by the parties.)

*Bonaparte* did die on the island of *St. Helena*, within the two years, or was dead at the time. The District Court, on a verdict being taken for *Phillips*, subject to the opinion of the court, gave judgment for the defendant. The case has been well argued, and deserves serious consideration, not from the amount in dispute, but from the principle involved.

Certainly a wager can generally be recovered in *England*, unless where betting on the particular subject, is prohibited by act of Parliament. When we reflect that no good can result to the community from the practice of betting, that much loss and domestic distress is occasioned by it, no wonder that in that country judges have regretted that it had been ever decided that a bet could be recovered. When our ancestors separated this country from *England*, it was, on the 28th of *January*, 1777, enacted, that the common law and such of the statute laws of *England* as have been in

(Phillips *v*. Ives.)

force in this province, shall be in force and binding, until altered, &c. Now, I have always believed, that the restrictive words "as have heretofore been" are as applicable to the common law as to the statute law. Much of both never was, and is not law here. And I would imitate those judges who decided, that gaming policies of insurance, though good at common law, were void here, as not suitable to the principles or genius of our institutions. In fact, this is a gaming policy; but, as I view this case, there is another principle on which the judgment of the court is right, admitting that some wagers can be recovered; but in this, I do not give the opinion of the court, who think the legislature only can prohibit a recovery in all cases of wagers.

No man or men have any right to occasion trouble or uneasiness to any other man or woman, and no court ought to assist them in so doing, or permit its jurisdiction to be abused for such purpose. It has been decided, that certain wagers, for example, whether a particular person was a man or woman, were not recoverable in a court of justice, because the proof might be indecent, and the investigation distressing to the persons. Although the testimony may not, in all cases, lead to inquiries, or call for proof, which is indecent; and although the investigation may in some possible cases, not occasion distress to the person who is the subject of the bet, yet the very same bet, and the evidence to be adduced, may be very distressing to another person about whom the second bet may be made. A man of undoubted wealth, not in debt, and not surety for any person, may feel perfectly indifferent as to an investigation in a court of justice, as to the precise amount of that wealth; but a man in other circumstances, may be much distressed and seriously injured. I may be perfectly indifferent as to a bet on my age, but there are no doubt many persons about whose age it would be impertinent to bet, and who would be much hurt by the investigation. Ordinarily, a man in prison for any cause is enough distressed; shall it be permitted that the question of when he will be liberated, shall be the subject of wagers among idle, or thoughtless, or malicious persons, and shall the courts of justice of the country add to that distress by listening to and collecting others to listen to all that malice or avarice may be able to collect on the subject? I would consider it as a case calling for a general rule, and say, that, as every bet about the age, or height, or weight, or wealth, or circumstances, or situation of any person, is either malicious or indecent, or impertinent, or indelicate, such bets are illegal, and that no court ought in any case, to sustain a suit on such wager; and this, whether the subject of the bet was man, or woman, or child, married or single, native or foreigner, in this country or abroad.

I can perceive no principle of law or justice, which will require or permit the time of the country and its courts to be wasted to gratify the malice, or the curiosity, or the caprice of the unthinking and impertinent. There are many things which politeness

(Phillips *v.* Ives.)

would not mention, and charity would conceal; I would not assist folly or malignity in making them public.    I would not as a man, and I will not as a judge—I hold that no bet of any kind, about any human being, is recoverable in a court of justice.

GIBSON, C. J., delivered the following opinion, in which SMITH, J., concurred.

I regret that my opinion is so fixed as to compel me to dissent. It seems to me, that the policy of the law, as already settled, is not a subject for our consideration.    Nothing like argument or reason has been adduced at the bar to show that the adjudications of the *English* courts prior to the *American* revolution, are not, as regards the point in controversy, binding authority and conclusive on the judgment of this court.    If they be disregarded in this instance, I see nothing to prevent us from uprooting the very foundations of the common law.    It has not been pretended that this wager would be invalid on any principle of those decisions.    The instance most apposite, is the wager respecting the restoration of the King; in which the incitement, if any were supposed, directly tended to implicate at least one of the parties in the guilt of treason, and to involve the country in a civil war.    In the case at bar, the mischievous consequences supposed to have been producible were, an enterprise against the island of *St. Helena;* the rescue of *Napoleon;* the selection by him of the *United States* as a place of refuge; the demand of his person by the *European* powers; the refusal of the *American* government; and, as a consequence of the whole— war.    Surely we ought to look at these matters with a practical eye to their probable results, instead of encouraging a train of idle fancies, by the aid of which there is no circumstance or contingency that may not be made pregnant with danger, and unlawful as the subject of a wager.    The catastrophe required the concurrence of so many accidents, as to set the accomplishment of it, at defiance. The most desperate speculator among us would not have dared to attempt what was beyond the combined means of the continental powers; nor would it have produced any consequences to the nation if he had; such an attempt being perfectly lawful, and producing no responsibility on the part of the government.    But it is said, no wager is lawful which creates an interest in the death of another.    The preceding remarks are equally applicable to this part of the case; for it is notorious, that it was just as difficult to take away the life of *Napoleon,* as to set him at liberty.    The law does not presume that any one would jeopard his own life for the insignificant consideration of winning a bet.    Of this, the case in which the parties agreed to run their fathers against each other, as it was termed, is a signal instance.    That case is also an authority in point against another position assumed in the argument, that no one is permitted to gain an interest in the concerns of another, by his own act.    It is undoubtedly true, that a wager which prejudices the in-

·(Phillips *v.* Ives.)

terest or outrages the feelings of a third person, is illegal; and were there colour to suppose that the wager in the case at bar, would have thus operated on the interest or feelings of *Napoleon*, I would agree that it ought not to be sustained.   But although dethroned and a captive, he was at an immeasurable distance from the parties, and beyond their influence or power.   It seems to me that questions of this sort, are to be considered in reference to the circumstances and condition of the individual.   The interest and feelings of every inhabitant of *Russia* and *Turkey* are doubtless wound up in the present contest between those two countries; and the dismemberment of the latter, would be a consequence quite as likely to be produced by the success of the former, as the catastrophe anticipated from the escape of *Napoleon:* yet tenderness for the feelings of the Sultan, would scarcely be thought to require the people of the *United States* to forego all speculation as to the event.   To come nearer home.   Betting on the success of particular candidates at an election, was thought to require a statute to make it unlawful.   A wager which would necessarily or even probably disturb the peace of an individual, is not to be encouraged; but it has not, I believe, been understood, that a morbid and overstrained sensibility, which in ordinary cases, does not exist, is the subject of special protection. It seems to me this wager tended neither to indecent evidence, nor to disturb the peace of the public, or of an individual; and that it was not, in its design or consequences, contrary to good manners or sound policy.   I am therefore of opinion that the action be sustained.

Judgment affirmed.