RUSSELL SCOTT, Appellant, v. MORGAN COURTNEY,
RESPONDENT.

7   419
20   79
15* 784

Gaming Debts not Recoverable.   Money won at a public gaming table is not recoverable by action, in this state.

Statute Licensing Gaming only Protects from Criminal Prosecution.   The statute licensing gaming, (Stats. 1869, 119) does not change the old rule of law that money won at a public gaming table is not recoverable by action ; it does not pretend to do more than protect the keeper of a public gaming house from criminal prosecution when a proper license is procured.

Appeal from the District Court of the Seventh Judicial District, Lincoln County.

The facts are stated in the opinion.

*Ashley, Thornton & Kelley*, for Appellant.

At common law, originally a special *indebitatus assumpsit* might be maintained for money won at gaming ; for the contract was not unlawful in itself, and the winner venturing his money was a sufficient consideration to entitle him to the action.   *Burling* v. *Frost*, 1 Esp. 235 ; 2 Bacon's Abridgement, 450 ; *Bryant* v. *Mead*, 1 Cal. 441.   Afterward it was held that money won at a common gaming house by the keeper could not be recovered, because gaming under such circumstances came to be considered *contra bonos mores*, and against public policy.   The question here is, whether the dealer of a faro game, licensed according to the law of this state, can recover from one who bets at his game on credit, loses, and refuses to pay the sum lost.

The license by its terms authorizes the licensee to carry on the game of faro.   Stats. 1869, 119, Sec. 3.   The right given by law to deal the game includes and carries with it the right to hold what is won, and to collect what is won where payment is refused.   By *licensing* and *authorizing it*, and taking money from the game for the public use, the legislature has determined that it is not *contra bonos mores*, and has provided expressly that it shall not be criminal.

*J. C. Foster*, for Respondent.

I. By the terms of the statute to restrict gaming, (Stats. 1869, 119, Sec. 3) the legislature has specially declared its intention, which was to protect any person having a license from criminal prosecution, and nothing more. ·This declared intention precludes any other interpretation as to its effect of the statute.

II. If there were any doubt as to what effect the legislature intended to give to a license, we have the authority of the Supreme Court of California, rendered on a statute similar to our own, for saying it only intended to protect parties who keep a game from criminal prosecution. *Bryant* v. *Mead*, 1 Cal. 441; *Carrier* v. *Brannan*, 3 Cal. 328.

By the Court, LEWIS, C. J.:

The facts of this case, as found by the judge below, are: "That during the month of April, A. D. 1871, the plaintiff kept a public gambling room in the house of one M. M. McClusky, in Pioche City,    *    *    *    *    and had therein a public game known as 'faro,' which he, the said plaintiff, dealt, the same having been licensed according to law. That in the fore part of said month of April, the defendant lost at the said game, kept and dealt by said plaintiff, during one evening, the sum of six hundred dollars; and not having the money in his possession, agreed to pay in a few days; that said amount consisted of checks given by said plaintiff to defendant, to play at the game; and that, in a few days thereafter, and during the same month, the defendant paid to the plaintiff the sum of five hundred dollars of the amount lost as aforesaid, leaving the sum of one hundred dollars still unpaid; that at the time the said sum of five hundred dollars was paid, the defendant again played at said game dealt by the plaintiff, and during the evening lost the sum of two thousand dollars. That the sum of twenty-one hundred dollars, lost as aforesaid, is the money for which this action is brought." Upon these facts judgment was rendered against plaintiff, from which he appeals.

Is money won at a public gaming table recoverable by action in this state? is the only question raised upon the record. We con-

clude it is not. Although, at the common law, gaming, when practiced innocently and as a recreation, the better to fit a person for business, was not in itself unlawful, still, the reluctance and loathing of the English judges to sustain even contracts growing out of such gaming is manifest in every decision announced upon the subject; and the result is, that the right of recovery is burdened with so many restrictions, that at present it can hardly be said the right exists at all.   In the United States, wagering and gaming contracts seem to have met with no countenance from the courts, and consequently in nearly every state they are held illegal, as being inconsistent with the interests of the community, and at variance with the laws of morality.   2 Smith's Leading Cases, 343.

But at common law all public gaming houses were nuisances, not only because they were deemed great temptations to idleness, but also because they were apt to draw together great numbers of disorderly persons.   4 Bacon's Abridgement, 451.   It would there-fore seem to follow, that money won in such house by the keeper could not be recovered, because everything connected with or growing out of that which was illegal partook of its character, and was tainted with its illegality.   So gaming, which might be innocent itself if carried on elsewhere, would become illegal by being conducted in a place which was condemned by the law.   This is an undoubted principle, applicable not only to cases of this nature but to all cases of analogous character.   Thus in *Badgley* v. *Beale*, 3 Watts, 263, it was held that a marker at an illicit billiard table, who kept the games and received the money bet by the players, was not entitled to recover wages from the owner of the table, the contract of employment being affected with the illegality of the business in which he was employed.   There is no doubt whatever that, upon this principle at common law, money won in a public gaming house would not be recovered by the keeper.

Does the statute of this state then, licensing gaming, change the old law in this respect ?  We think not.   The statute does not pre-tend to do more than to protect the keepers of public gaming houses from criminal prosecution when a proper license is procured.   Section 2, declaring that, " The said license shall protect the licensee and his employee or employees against any criminal prosecution for

dealing and carrying on the game mentioned," thus appearing to restrict the effect of the license to simple protection of the persons engaged against punishment, and leaving gaming houses in all other respects precisely as they were formerly, civilly subject to all the disapprobation and restrictions of the common law. In *Bryant* v. *Meade*, 1 Cal. 441, it was held that a sum of money won at a public gaming house kept by the plaintiff could not be recovered by him; and the court were of the opinion that a license to keep such house conferred no right to sue for a gaming debt, but constituted a protection solely against criminal prosecution. So, also, it was held in *Carrier* v. *Brannan*, 3 Cal. 328. If the law in this state did not, in express terms, limit the effect of the license, we would not be inclined to place this construction upon it; but its language, it seems to us, is too plain to admit of any other interpretation.

That the statute of this state expressly authorizes the persons having a license to carry on the game designated, manifestly makes no substantial difference between it and the California act, under which the decisions above referred to were rendered, for it will not be denied that the California license as fully and completely authorized the game licensed, as do those issued under our statute. Clearly, the very object, and probably the only effect, of the California license was to authorize the game licensed. If they did not authorize the game, what was the object of the license at all? It is palpable there is not, in this respect, any distinction between the statutes. The decisions are therefore directly in point.

Let the judgment be affirmed.

By GARBER, J., dissenting:

It may be that this action could not have been maintained at common law. But the only ground upon which it could have been defeated would have been, the illegality of the transaction,—that a *common* gaming house was unlawful and indictable as a nuisance. With this possible exception, the playing at dice and cards was not prohibited by the common law, in the absence of deception or fraud; and therefore, it is said, playing at dice, cards, &c., is not *malum in se.* Case of Monopolies, 11 Co. 87 (b).

So, Lord Kenyon directed a recovery for money won at seven-up, and Lord Chancellor Cottenham, apparently without the slightest sense of humiliation, while sitting in a court of equity, held that money won at a public gaming table, or lent for the purpose of gambling, in a country where the games in question were not illegal, might be recovered in the courts of England. *Quarrier* v. *Colston*, 1 Phillips, 147. It is a clear inference from his reasoning that, where the government sanctions a public gaming table and receives rent from the keepers thereof, the game is not illegal and money won thereat is recoverable. We have also the authority of Mansfield and Kenyon for the assertion that the English statutes which prohibit certain specified wagers, *e. g.* excessive gambling or gambling on ticket, imply that in cases not specially prohibited by act of parliament, parties might wager or game at pleasure.

Thus the statute Car. II recognizes the common law right of recovery for sums (whatever the amount) won by playing at or with cards or dice, and only restricts such recovery to sums not exceeding £100. See also 1 Phillips, *supra*, where it was held, referring to another statute, that a sum under £10, won at cards, might be recovered. This could not be, if gambling *per se* and without reference to the illegality of the game was either contrary to good morals or public policy, in so far as the courts, for that reason, would refuse to entertain an action based upon such a contract.

It seems to me that our legislature, the final arbiter on questions of policy and morality, has, by this statute, abrogated the only objection to the plaintiff's right of recovery, which existed at the common law. The statute expressly provides that the license shall *by its terms authorize the licensee to carry on the game.* Such a license confers upon and gives to the licensee authority and right to do the very thing we are asked to hold contrary to public policy. See *License Cases*, 5 Wallace, 462; where the distinction is drawn between a license of this kind, and such as are to be regarded as a mere form of imposing a tax, and as implying nothing except that the licensee shall be subject to no prosecution under the law, if he pays a tax; or the distinction between what is in reality, as well as in mere semblance, a license, and what, though nominally such, is in substance only a special tax. The provision giving authority in

terms was not contained in the California statute, construed in the
first and third volumes of the reports of that state, and was prob-
ably here inserted in view of the distinction taken in the license
cases, then recently decided by the highest judicial tribunal in the
nation.   At any rate, with that opinion before them, the framers
of our statute could scarcely have used apter words to preclude
the idea that they intended *only* to impose a tax and remit a pen-
alty.   The evidence that this unusual clause was directed to be
inserted in the license, with especial reference to the opinion in the
license cases, is intrinsic and convincing.   In that opinion the fol-
lowing language occurs :   " It is not doubted that where congress
possesses constitutional power to regulate trade or intercourse, it
may regulate by means of licenses as well as in other modes ; and,
in case of such regulation, a license will give to the licensee *author-
ity to do whatever is authorized by its terms ;*   *   *   *   and the
same observation is applicable to every other power of congress, to
the exercise of which the granting of licenses may be incident.
All such licenses confer authority and give rights to the licensee."
It next enunciates the conceded doctrine, that the power to regu-
late and control any domestic or internal trade or occupation
belongs exclusively to the states.   The statute in question betrays
nowhere the hand of a novice.   He who drafted it was evidently
master of all the learning bearing on the subject. ᷩ  According to
the opinion quoted from, if, following the form of the federal statute
therein construed, he had stopped with the provision that any one
who should carry on this game without a license should be liable
to the penalty imposed, there would have been little room for doubt-
ing the intention to " express something more than the purpose of
the state not to interfere by penal proceedings with the occupation
licensed, if the required fee were paid."   Because, although it
might have been objected that no authority was conferred *by the
terms of the license ;* yet, it would have been clear that this was a
license granted by the state, in the exercise of an undoubted power
to regulate this particular occupation.   But, *to make assurance
doubly sure ;* in order to leave no room for implication or doubt, it
was enacted in the very language of the opinion, that the license
should in terms authorize one of the games mentioned in the first

section of the act, and one of the games mentioned in said first section, is *faro*, "*whether the same be played for money or on credit.*"

The court, in the case cited, further say : " This court can know nothing of public policy except from the constitution and the laws. It has no legislative powers.  It cannot amend or modify any legislative act.  It cannot examine questions as expedient or inexpedient, as politic or impolitic.  Considerations of that sort must, in general, be addressed to the legislature.  Questions of policy determined there, are concluded here."  See also 21 How. (U. S.) 425–6; that " when the legislature relieves a contract from the imputation of illegality, neither of the parties to the contract are in a condition to insist upon this objection."  And opinion of Judge Gibson, 1 Rawle, 43.

But it is contended, in effect, that the portion of the statute which in terms relieves this transaction from the imputation of illegality, is so limited and qualified by a subsequent clause, that .licenses issued under this statute can have no further or other operation than those passed upon in the license cases.  The clause relied upon for this position reads :  " The said license shall protect the licensee    *    *    *    *    against any criminal prosecution for dealing or carrying on the game mentioned, in the room described, during said three months, *but not for dealing or carrying on any other game than that specified, or the specified game in any other place,*" &c.   This clause does not purport to limit the effect of the statute, or to qualify the sanction expressed, so far as the act done corresponds, in kind, place, and time, with the act licensed.   It simply, out of abundant caution, prescribes to the immunity resulting from the sanction given, limits coextensive with those imposed upon the authority conferred ; thus at once restricting the immunity to the game, time and place specified in the license, and extending it to the lighter penalty imposed by the general criminal statute, for common law misdemeanors.   It seems rather a violent strain of language to consider a declaration that a license shall protect no other game than the one mentioned, equivalent to a declaration that such protection shall be its only effect ; and thus, by mere implication, to nullify a previous clause expressly author-

izing the licensee to carry it on. I think the contention resolves itself into a misapplication of the maxim, *expressio unius*, &c., leading to results inconsistent with the letter and spirit of the statute. For, the intent to legalize the transaction is as clearly expressed as that relied upon to exclude it. While it is true, generally, that what is expressed makes what is implied to cease, it is equally true, that a clause distinct and without exception in itself, cannot be controlled or limited by a doubtful implication drawn from a subsequent clause. 70 E. C. L. Rep. 140. The idea seems to be that the statute grants a sort of secular indulgence — that the game, though licensed, is still illicit; that the licensee has paid the state a handsome *bonus* for permission to violate the law; but that the act is as illegal as ever, the only effect of the statute being, that it cannot be punished *criminaliter*. And the result is, that the landlord, whose tenant the licensee becomes, the employees who assist him, and the tradesmen who sell to him articles to be used in carrying on a business which he has purchased a right to carry on, must refuse him credit or rely on his word for payment.

The reasoning of the California cases is that we must adopt this forced and artificial construction of the statute, rather than impute to the legislature an intent to legalize contracts so tainted with vice and immorality — an imputation, it is said, as unjust to them as the enforcement of such contracts would be humiliating to the courts. But the legislature is presumed to have known the then existing law of this state: that we had adopted the common law, according to which, bets won at seven-up, poker, horse-racing, and an infinity of other wagers, were valid and enforceable contracts: that we had not enacted or adopted the statutory provisions, elsewhere almost universally in force, prohibiting or restricting such gambling, or confining parties playing for money to such sums as they should pay down at the time of the play. If betting at a faro game, licensed and conducted according to the provisions of this statute, is immoral and contrary to the public policy, so is betting at poker and upon horse-racing. It is as humiliating to the courts to enforce the latter as to enforce the former. In giving, then, to the explicit language of the statute its natural force and effect, we only

impute to the legislature the opinion that such games as this, **if** conducted in a place less public than the front room of the ground floor of any building, and which no person under the specified age is allowed to enter, stand on the same footing as those games to which, by the common law, no stigma of illegality is attached: and that adults of sound mind may be as safely trusted to bet on credit at the one as at the other.

But, with the wisdom and purity of the sentiments which actuated the legislature, we have nothing to do.     Let it be conceded that in this regard both the common law and this statute are as bad as the sternest precisian ever pronounced them.     The worse they are, the sooner will a strict enforcement of them lead to their amendment — a corrective by no means so easily applied to an assumption by the courts of legislative functions.     For these reasons I dissent from the judgment.