**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0460n.06

No. 12-3956

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*May 09, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| VIRGINIA STARK, | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| MARS, INC. et al., | ) | |
| | ) | |
| **Defendants-Appellees.** | ) | **O P I N I O N** |
| _____ | ) | |

Before:  DAUGHTREY, MOORE, and STRANCH, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.**  For five months in 2009, Virginia Stark received benefits that were more than double what she was entitled to receive under her pension plan.  She brought suit to estop Mars Inc. U.S. Benefit Plans Committee ("the Committee") from thereafter paying Stark her actual benefits instead of the higher benefits.  Stark also alleged that the Committee breached its fiduciary duty to her by misrepresenting the value of her pension benefit. Stark now appeals the denial of her summary-judgment motion, as well as the grant of summary judgment to the Committee and to Mars, Inc. ("Mars").  We **AFFIRM** the judgment of the district court.

**I.  FACTS AND PROCEDURE**

Stark worked for Mars from 1982 to 2004, during which time she participated in the Mars Retirement Plan ("MRP").  Before retiring in 2004, Stark accepted Mars's offer to switch her to its

Associate Retirement Plan ("ARP"). Among other things, Stark's ARP accrued 3% interest above

inflation until she elected to begin withdrawing her benefits. Moreover, individuals who switched

from MRP to ARP—referred to as "ARP-elect beneficiaries"—were guaranteed to receive the higher

of either their new ARP benefits or their old MRP benefits as calculated on the day of transition to

ARP. Stark retired later that year.

In August 2008, the Committee, through Hewitt Management Company ("Hewitt"), informed

Stark that she had an account balance of $378,763.58, which she could draw from at any time. R.

45-9 (Vested Benefit Reminder at 1) (Page ID #1424). Hewitt operates and maintains the database

for Mars's retirement plans; Hewitt also runs a website that allows plan participants to calculate their

potential benefits. Stark visited the website on February 9, 2009, and received the following benefit

estimates for different plans beginning that June: $5,365 per month for a five-year-certain annuity;

$3,669 per month for a five-year-certain, inflation-adjusted annuity; $2,309 per month for a ten-year-

certain annuity; and $3,644 per month for a ten-year-certain, inflation adjusted annuity.[1]  R. 43-15

(Docs. to Support Benefits Claim at 9) (Page ID #643). The first annuity option—estimating that

she would receive $5,365 per month—piqued Stark's interest.

On February 10, 2009, Stark called the Mars Benefits Service Center ("Benefits Center") and

spoke with benefits specialist Jessica Pierson. R. 45-13 (2/10/2009 Call Tr. at 1) (Page ID #1441).

Benefits specialists are not actuaries; like participants, they rely on Hewitt's website to calculate

---

[1]Under an X-year-certain plan, the Committee pays a designated beneficiary if the participant dies within X years of the selected plan. If a participant dies after collecting benefits for more than X years, the beneficiary does not receive payments.

benefits options. Relying on the website, Pierson noted that Stark would receive "$5,364.63 a month." *Id.* at 2 (Page ID #1442). Stark decided to begin the process of electing her benefits. The next day Hewitt delivered, on Mars's letterhead, two documents each entitled "Pension Estimate Calculation Statement." Both statements included the following disclaimer: "Mars, Incorporated reserves the right to correct any errors. Specifically, if the estimate conflicts with the benefit defined by the USRP, the USRP will prevail. Under the law, a plan must be operated in accordance with its terms."[2] R. 45-10–11 (Pension Estimate Calculation Statements at 2, 2) (Page ID #1428, 1433). The statements identified payment estimates for several plans based on commencement dates of June 30, 2009 and December 31, 2009. As before, the five-year-certain annuity was estimated to pay $5,364.63 per month under either commencement date. *Id.*

On February 17, 2009, Stark again called Pierson at the Benefits Center. R. 45-14 (2/17/2010 [sic] Call Tr. at 1) (Page ID #1449). Pierson confirmed that, according to Hewitt's website, the $5,364.63 estimate had not changed. *Id.* Pierson also determined that Stark could commence her five-year-certain annuity as early as March 2009 while still receiving the same estimate. *Id.* at 4–5 (Page ID #1452–53). The next day, Hewitt delivered—again, on Mars's letterhead—information about commencing benefits, which repeated the estimates and the disclaimers. R. 43-15 (Docs. to Support Benefits Claim at 35–38) (Page ID #669–72). On February 24, 2009, Stark signed a pension election authorization form to commence receiving her benefits. In so signing, Stark certified that she understood the terms of Mars's disclaimers. *Id.* at 54 (Page ID #688).

---

[2]A similar disclaimer appeared at all times on Hewitt's website.

Stark collected monthly payments of $5,364.63 beginning in March 2009 and running through July 2009. However, during this time period Hewitt determined that a programming error in its software resulted in an excessively high calculation for ARP-elect participants.[3] Hewitt reported the programming error to the Committee on April 28, 2009. R. 43-19 (4/28/2009 Email) (Page ID #707–08). The Committee asked to know which participants were affected by the error, at which point Hewitt confirmed that Stark was receiving payments in excess of what she was entitled to under the plan. In July 2009, the Benefits Center informed Stark that her monthly payments had been miscalculated—Stark's corrected monthly payment was $2,303.18. R. 43-21 (Farino Dep. at 58–59) (Page ID #735–36); *see* R. 45-15 (Overpayment Letter) (Page ID #1458–60).

Stark filed a claim with the Committee on September 29, 2009, seeking to continue receiving benefits of $5,364.63 per month. The Committee took this letter as a formal claim for benefits, at which point Stark submitted documents to support her claim. R. 43-15 (Docs. to Support Benefits Claim at 1) (Page ID #636). In a December 23, 2009 letter, a delegate for the Committee denied Stark's request to continue receiving higher benefits. R. 52-1 (Letter Decision at 3) (Page ID #1564). While Stark was initially expected to return her overpayments—Stark's post-July 2009 payments had been garnished to reimburse the plan for five months of overpayment—the letter stated that Mars would repay the overpayment to the plan with interest. *Id*. Stark received a check to cover the payments garnished from August to December. In addition, the letter decision stated that Stark

---

[3]Hewitt's software had been calculating ARP-elect participants' ARP payments based on the age at which they withdrew payments, but calculating MRP payments based on withdrawal commencing at age 65.

4

would be given a one-time opportunity to opt out of her selected annuity—she could either change to a new annuity, or she could undo the commencement of her benefits and return to her status as she was in January 2009, with an uncommenced ARP accruing interest. *Id.* at 3–4 (Page ID #1564–65).

Stark filed suit against several parties; the lawsuit eventually named Mars and the Committee as defendants. R. 7 (First Am. Compl.) (Page ID #13–20); R. 56 (Order to Substitute Real Parties in Interest) (Page ID #1611). On May 11, 2011, the district court dismissed several claims against the parties, but left remaining Stark's claims of equitable estoppel and breach of fiduciary duty. *Stark v. Mars, Inc.*, 790 F. Supp. 2d 658 (S.D. Ohio 2011). Both sides sought summary judgment on the remaining claims. On July 17, 2012, the district court denied Stark's motion for summary judgment, and granted summary judgment to both defendants on all claims. *Stark v. Mars, Inc.*, 879 F. Supp. 2d 752 (S.D. Ohio 2012). Stark timely appealed.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *Trs. of Mich. Laborers' Health Care Fund v. Gibbons*, 209 F.3d 587, 590 (6th Cir. 2000). While drawing all inferences "in the light most favorable to the non-movant," *id.*, we determine whether "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If so, then summary judgment is appropriate.

### III. EQUITABLE-ESTOPPEL CLAIM

Stark seeks to estop the Committee from paying her the lower, corrected benefits instead of the higher benefits. An equitable-estoppel claim under ERISA consists of the following elements:

> (1) [T]here must be conduct or language amounting to a representation of material fact; (2) the party to be estopped must be aware of the true facts; (3) the party to be estopped must intend that the representation be acted on, or the party asserting the estoppel must reasonably believe that the party to be estopped so intends; (4) the party asserting the estoppel must be unaware of the true facts; and (5) the party asserting the estoppel must reasonably or justifiably rely on the representation to his detriment.

*Marks v. Newcourt Credit Grp., Inc.*, 342 F.3d 444, 456 (6th Cir. 2003) (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 403 (6th Cir. 1998) (en banc)). When an equitable-estoppel claim arises in the context of an unambiguous pension plan, a plaintiff must further demonstrate "[(6)] a written representation; [(7)] plan provisions which, although unambiguous, did not allow for individual calculation of benefits; and [(8)] extraordinary circumstances in which the balance of equities strongly favors the application of estoppel." *Bloemker v. Laborers' Local 265 Pension Fund*, 605 F.3d 436, 444 (6th Cir. 2010).

The district court granted summary judgment to the Committee on the basis that, as a matter of law, Stark could not establish four elements of a successful equitable-estoppel claim[4]: that the Committee was aware of the true value of Stark's benefits, that the Committee intended for its representations about Stark's benefits to be relied upon, that Stark justifiably and detrimentally relied

---

[4]The district court granted summary judgment to Mars because only the Committee pays Stark her plan benefits. *Stark*, 879 F. Supp. 2d at 762 (citing *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 553 (6th Cir. 2012)). Stark does not appeal this determination.

on the Committee's representations, and that this case presented extraordinary circumstances. We conclude that the Committee was not aware of the true value of Stark's pension benefits and that Stark did not detrimentally rely on representations made to her by the Committee about the value of her benefits. Because Stark thus fails to establish all of the elements of her equitable-estoppel claim, we conclude that the district court correctly granted summary judgment to the Committee on Stark's equitable-estoppel claim.

## A. Second Element: The Committee's Awareness of a True Fact

The district court found that there was no genuine dispute that the Committee was not "aware of the true value of [Stark's] pension benefit," and so granted summary judgment to the Committee with respect to the second element of equitable estoppel. *Stark*, 879 F. Supp. 2d at 762. "The second element [of equitable estoppel] requires the plaintiff to demonstrate that the defendant's actions 'contain[ed] an element of fraud, either intended deception or such gross negligence as to amount to constructive fraud.'" *Bloemker*, 605 F.3d at 443 (quoting *Crosby v. Rohm & Haas Co.*, 480 F.3d 423, 431 (6th Cir. 2007)); *see also Crosby*, 480 F.3d at 431 (finding that the elements of estoppel were not satisfied where the party to be estopped "made an honest mistake," such that "it was guilty of misfeasance, not the malfeasance that estoppel requires").

Stark does not suggest that the Committee intended to deceive her about the value of her benefits. Rather, she argues that the Committee acted with gross negligence amounting to constructive fraud. For support, Stark identifies a conversation she had about her pension election authorization form with another benefits specialist, Linda Vesey-Connors, immediately prior to

commencing her benefits. On February 23, 2009, Vesey-Connors informed Pierson that Vesey-Connors had answered a question for Stark regarding the paperwork. R. 43-7 (2/23/2009 Email) (Page ID #460). Vesey-Connors had previously worked with another ARP-elect participant (identified by the parties as "B.C.") whose high estimates appeared suspect, which prompted Vesey-Connors to raise her concern with the Benefits Center. The Benefits Center referred that concern to Hewitt on February 16, 2009. R. 43-17 (2/16/2009–2/17/2009 Emails at 2) (Page ID #701). The next day, Hewitt explained in an email that B.C. was an ARP-elect participant, and that an ostensibly high estimate was explainable by the fact that ARP-elect participants received the greater of the benefits payments under their ARP and their former MRP. *Id*. at 3–4 (Page ID #702–03).

Stark now argues that Pierson—because she spoke with Vesey-Connors, and because of Vesey-Connors's concerns about B.C.—suspected there was a glitch in Hewitt's benefits-calculation program, that Pierson conveyed her concerns to mangers at the Benefits Center, but that the Benefits Center did not refer Stark's case to Hewitt. Even assuming these claims to be true, they do not establish gross negligence on the part of the Committee. The record demonstrates that the Benefits Center referred concerns about the calculation of B.C.'s benefits to Hewitt. Hewitt then explained that a seemingly high estimate for ARP-elect participants would nevertheless be accurate. Thus, the Committee properly investigated the exact concern that Stark raises, and it had no reason to question further Hewitt's calculations until late April.[5] Even though Hewitt's assurances ultimately proved

---

[5]Stark notes that Hewitt mentioned in its February 17 email that its software was not comparing two separate ARP annuities to their MRP counterparts, and that Hewitt would investigate. R. 43-17 (2/16/2009–2/17/2009 Emails at 4) (Page ID #703). Regardless, this observation did not

inaccurate, the Committee's reliance on those assurances was at most an honest mistake, and did not rise to the level of malfeasance. Accordingly, we conclude that the Committee was not aware of the true value of Stark's pension benefit at the time it made misrepresentations to Stark.

## B. Fifth Element: Detrimental Reliance

The district court found that Stark did not rely to her detriment on any representations made by the Committee with respect to the value of her pension benefits. In particular, the district court found that Stark had not altered her discretionary-spending habits, and that pet-related expenses she incurred were not "taken in reliance on any earlier representations of a higher benefit amount." *Stark*, 879 F. Supp. 2d at 767–68. In addition, Mars reimbursed the plan for the amount of the overpayments made to Stark and permitted Stark to change her plan enrollment or to return to the pre-enrollment status that she held in January 2009. *Id.* at 769.

We agree that there is no genuine dispute that Stark did not detrimentally rely on the Committee's misrepresentations about the value of her benefits. First, a review of the several months before and after receiving her plan benefits indicates that she did not alter her discretionary-spending habits. According to Stark's own calculations, her discretionary spending in some months before the plan went into effect was higher than in-plan months, while discretionary spending in some months after the extra benefits were cancelled was higher than in-plan months. *See id.* at 767. Second, while Stark was receiving extra benefits, she elected to submit her chronically ill cat to an

---

call into question the email's discussion of seemingly high estimates for five-year-certain annuities. It was not grossly negligent for the Committee to fail to treat the presence of an unrelated, identified concern as reason to doubt the entirety of Hewitt's software program.

expensive hospitalization; after the extra benefits were cancelled, and when the cat's health again needed a major investment, Stark opted for euthanasia. Had she never received the benefits, Stark would have had to confront this earlier than she did; accordingly, while Stark relied on the extra funds to extend the life of her pet, this reliance was not to her detriment. Third, Mars eventually repaid the plan for the extra benefits paid to Stark, such that Stark was allowed to keep the entirety of the overpayments, and Mars offered her a one-time opportunity to change her benefits enrollment. R. 52-1 (Letter Decision at 3–4) (Page ID #1564–65). Thus, any detriment that Stark would otherwise have suffered—either by having to make reimbursement payments to the Committee, or by no longer accruing interest on an unexercised plan—has been undone by Mars's contribution. We conclude that there is no genuine dispute that Stark did not detrimentally rely on the Committee's representations about the value of her plan benefits.

Because we conclude that there is no genuine dispute both that the Committee was not aware of the true value of Stark's benefits and that Stark did not detrimentally rely on the Committee's misrepresentations, as a matter of law Stark is unable to establish all elements of a successful equitable-estoppel claim. Accordingly, the district court was correct to grant summary judgment to the Committee on Stark's equitable-estoppel claim.

## IV. BREACH–OF-FIDUCIARY-DUTY CLAIM

In addition to her equitable-estoppel claim, Stark alleges that the Committee misled her in violation of its fiduciary duty. *See* 29 U.S.C. § 1104(a)(1)(B) (establishing a duty of care for ERISA fiduciaries). The district court found that, as a matter of law, Stark was unable to satisfy any element

of a successful breach-of-fiduciary-duty claim. *Stark*, 879 F. Supp. 2d at 772–75. Because we conclude that any misrepresentation made by the Committee was not made negligently, we agree with the judgment of the district court to grant summary judgment.

"ERISA imposes a 'prudent person' fiduciary obligation, which is codified in the requirement that a plan fiduciary exercise his duties 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.'" *Krohn v. Huron Mem'l Hosp.*, 173 F.3d 542, 547 (6th Cir. 1999) (quoting 29 U.S.C. § 1104(a)(1)(B)). In the context of representations made by a plan fiduciary to a participant, we have "recognized an equitable claim by a participant against an ERISA plan fiduciary . . . when a fiduciary misleads a participant or beneficiary." *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 432 (6th Cir. 2006). An ERISA fiduciary breaches its duty by making material misrepresentations to a participant, provided that its "statements or omissions were made negligently or intentionally." *Krohn*, 173 F.3d at 547; *see Moore*, 458 F.3d at 432 (noting that misleading a participant about "the extent of benefits under a plan" would be material (quoting *Drennan v. Gen. Motors Corp.*, 977 F.2d 246, 251 (6th Cir. 1992))). By contrast, "[a] plan fiduciary may rely on information, data, statistics or analyses furnished by persons performing ministerial functions for the plan . . . if, in the exercise of ordinary care in such situation, [it] has no reason to doubt the competence, integrity or responsibility of such persons." 29 C.F.R. § 2509.75–8 (FR–11) (interpreting 29 U.S.C. § 1104).

In the instant case, Hewitt performed a ministerial function for the Committee by managing software to calculate benefits according to unambiguous plan terms. The Committee relied on Hewitt's program to provide accurate estimates of a participant's plan benefits. The Committee did not have reason to doubt Hewitt's competence at the time the Committee misrepresented to Stark the value of her benefits plan, because the Committee would not learn of Hewitt's programming error for several months. Accordingly, the Committee's misrepresentations to Stark were made in reliance on Hewitt's ministerial calculation; they were neither intentional nor negligent. Therefore, the district court was correct to grant summary judgment to the Committee on Stark's breach-of-fiduciary-duty claim.

## V. CONCLUSION

For the reasons described above, we **AFFIRM** the judgment of the district court.