*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0104p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

AMANDA CROSBY, Administratrix for the Estate of
BILLY K. ALLRED,

                        *Plaintiff-Appellant,*

        *v.*

ROHM & HAAS COMPANY,

                        *Defendant-Appellee.*

> No. 06-5347

---

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 04-00332—John G. Heyburn II, Chief District Judge.

Argued: January 31, 2007

Decided and Filed: March 16, 2007

Before: GILMAN and SUTTON, Circuit Judges; TARNOW, District Judge.[*]

---

## COUNSEL

**ARGUED:** Stephen C. Emery, STEWART, ROELANDT, STOESS, CRAIGMYLE & EMERY, Crestwood, Kentucky, for Appellant. Raymond A. Kresge, COZEN O'CONNOR, Philadelphia, Pennsylvania, for Appellee. **ON BRIEF:** Stephen C. Emery, John Frith Stewart, STEWART, ROELANDT, STOESS, CRAIGMYLE & EMERY, Crestwood, Kentucky, for Appellant. Raymond A. Kresge, COZEN O'CONNOR, Philadelphia, Pennsylvania, for Appellee.

---

## OPINION

---

SUTTON, Circuit Judge. Amanda Crosby filed this lawsuit against Rohm and Haas under the Employee Retirement and Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*, seeking to recover benefits allegedly owed to her as a beneficiary of her father's life insurance policy with the company. She also sought monetary penalties from the company because it allegedly violated ERISA's disclosure requirements. The district court granted summary judgment for Rohm and Haas, reasoning that Crosby received all of the life insurance benefits she was due and that the company's conduct did not warrant monetary penalties. We affirm.

---

[*] The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan, sitting by designation.

I.

On June 12, 2000, Rohm and Haas promoted Billy Allred to be the production manager of its Louisville, Kentucky facility. In his new position, Allred became eligible for Rohm and Haas's Health and Welfare Plan for salaried employees, which provided a basic life insurance benefit of $10,000 plus three times the employee's annual salary. The plan also gave employees the option of purchasing supplemental life insurance (in 25% increments) up to three times their base salary. Allred purchased supplemental insurance of 175% of his base salary.

In the fall of 2000, Rohm and Haas announced a change to the plan's life insurance benefits. It mailed a booklet entitled "Time to Enroll for Your 2001 Benefits" to all salaried employees, which noted that "[t]here are a number of changes to your health care and group insurance benefits for 2001," JA 99, and explained the material modifications to the plan's life insurance coverage. For 2001, the company decreased the basic life insurance benefit to two times an employee's salary and increased the maximum supplemental coverage that employees could purchase to six times their salary (in 100% increments). It also eliminated the $10,000 basic life insurance benefit for all active employees. The booklet also noted that employees did not need to enroll in the new plan if they "want[ed] to keep the same supplemental employee life insurance coverage [they] had last year, as long as it was in 100% increments." JA 109.

Included with the booklet was an enrollment worksheet that listed "information about [an employee] and [his] dependents, the coverage [he would] automatically receive if [he did not] call to enroll, as well as the plans, and their monthly costs, for which [the employee was] eligible in 2001." JA 97. The booklet advised each employee: "Be sure to check your *Enrollment Worksheet* to confirm the life insurance you'll receive in 2001 if you don't call the Benefits Center by December 13 to enroll." JA 109. It also urged each employee to "review [the worksheet] for accuracy" and to "call the Benefits Center right away and speak to a representative" if "any errors or omissions" were found. JA 100.

The benefits listed in Allred's attached worksheet differed from the benefits to which he was entitled under the new plan. As Allred's default coverage, for example, it listed the features of his prior coverage—$10,000 plus three times his base salary as his basic coverage and 175% of his base salary as his supplemental coverage—not one benefit of which was accurate under the new plan. Allred's total coverage thus was listed as $289,000 and required Allred to contribute $18.54 each month. Because Allred never called to enroll in the new plan, Rohm and Haas confirmed by letter on December 15, 2000, that he would receive the default coverage.

On February 24, 2001, Rohm and Haas confirmed Allred's coverage for the period starting March 1 but recalculated his total benefit to be $303,000 (Allred had received a raise in the interim) and his monthly contribution to be $19.44. The company calculated Allred's anticipated benefit using the same (mistaken) formula it had used before.

On April 7, 2001, Rohm and Haas sent a letter to Allred confirming his coverage for the period starting May 1. This letter no longer used the old formula for calculating benefits but instead followed the formula described in the booklet: a primary life insurance benefit equal to twice his base salary and a supplemental insurance benefit of 100% of his base salary. Correspondingly, Allred's monthly contribution decreased to $11.52. The letter, however, still listed the $10,000 flat coverage as a basic benefit, so Allred's anticipated total life insurance coverage was listed as $202,000. A separate letter from Rohm and Haas, dated July 6, 2001, confirmed these calculations.

Allred died on December 11, 2001. Rohm and Haas sent Amanda Crosby, the administratrix of his estate, $192,000 in life insurance proceeds based on Allred's coverage as described in the booklet. On August 9, 2002, noting the discrepancy between the amount paid and the amount listed

on Allred's enrollment worksheet, Crosby sent a letter to the Rohm and Haas Benefits Center requesting plan documents related to Allred's life insurance coverage. After receiving no response, Crosby again wrote the Benefits Center, making the same request, on October 28, 2002. Because the Benefits Center was not the administrator (and was not operated by Rohm and Haas), Rohm and Haas did not receive either letter until November 19, 2002. On January 9, 2003, Rohm and Haas responded to Crosby's requests by letter explaining the changes made to the plan in the fall of 2000 and by attaching the booklet along with relevant portions of the former summary plan description. On January 28, 2003, Crosby acknowledged receipt of Rohm and Haas's January 9 letter and requested "a copy of the entire SPD . . . and any other information concerning survivor pension benefits." JA 331. On February 11, 2003, Rohm and Haas sent Crosby the summary plan description from the fall of 2000.

Crosby filed a claim for additional insurance benefits with the plan administrator, who denied her claim. Crosby then filed a complaint in federal district court seeking to "recover benefits due to [her] under the terms of [the] plan," 29 U.S.C. § 1132(a)(1)(B), and claiming that Rohm and Haas had failed to furnish requested information to her in violation of 29 U.S.C. § 1132(c)(1). On cross-motions for summary judgment, the district court held that Rohm and Haas had validly amended the plan and that the terms described in the booklet trumped those in Allred's individualized worksheets. The court also declined to assess penalties against Rohm and Haas under § 1132(c)(1) because "Rohm and Haas made a good-faith attempt to comply with [Crosby's] request and its failure to comply with all of [her] requests did not prejudice [her] in any meaningful way." JA 48. Crosby appeals both decisions.

## II.

We review the district court's grant of summary judgment de novo. *EEOC v. Univ. of Detroit*, 904 F.2d 331, 334 (6th Cir. 1990). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmovant, *id.*, "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," Fed. R. Civ. P. 56(c). Because the Rohm and Haas Health and Welfare Plan invested the administrator with discretion to construe its terms, we review the administrator's decision under the deferential arbitrary and capricious standard. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). And because a district court has discretion in deciding whether to assess penalties under § 1132(c)(1), we review such decisions for an abuse of discretion. *Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1068 (6th Cir. 1994).

## A.

ERISA sets forth a comprehensive national framework by which companies may provide health and welfare plans to their employees. *See* 29 U.S.C. § 1144(a). Although ERISA does not compel companies to create such plans, it requires them to memorialize the terms of any such plans through formal plan documents. *Id.* § 1102(a)(1). Among other things, the plan must define who will administer it, *id.*, how it will be administered, *id.* § 1102(b)(2), and "the basis on which payments are made to and from the plan," *id.* § 1102(b)(4). Aware of the technical language frequently (and perhaps necessarily) used to define these plans, Congress directed plan administrators to provide employees with a summary plan description that is "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan," *id.* § 1022(a), and to distribute this description using means "reasonably calculated to ensure actual receipt of the material," 29 C.F.R. § 2520.104b-1(b)(1). *See* 29 U.S.C. § 1022(b) (outlining requirements of a summary plan description); 29 C.F.R. § 2520.102-3 (same). "[S]tatements in a summary plan [document] are binding[,] and if such statements conflict with those in the plan itself, the summary shall govern." *Edwards v. State Farm Mut. Auto. Ins. Co.*, 851 F.2d 134, 136 (6th Cir. 1988).

The plan administrator may amend a plan only through formal procedures specified in the plan documents, 29 U.S.C. § 1102(b)(3), not through informal communications. *See Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 403 (6th Cir. 1998) (en banc) (refusing "to sanction informal 'plans' or plan 'amendments'—whether oral or written"); *Flacche v. Sun Life Assurance Co. of Can.*, 958 F.2d 730, 736 (6th Cir. 1992) (holding that even "formal statements made to beneficiaries concerning the plan or benefits, which are relied upon by the beneficiaries," are not enforceable if not part of a summary plan document); *Musto v. Am. Gen. Corp.*, 861 F.2d 897, 910 (6th Cir. 1988) (rejecting oral communications as a means of modifying a plan). After a company validly amends a plan, plan administrators need not immediately update and republish the summary plan document; they may instead furnish employees with a summary of material modifications "written in a manner calculated to be understood by the average plan participant," 29 U.S.C. § 1022(a), so long as they provide an updated summary plan description to participants every five years, *see id.* § 1024(b)(1).

An employee benefit plan must "maintain reasonable procedures governing the filing of benefit claims, notification of benefit determinations, and appeal of adverse benefit determinations." 29 C.F.R. § 2560.503-1(b); *see* 29 U.S.C. § 1133(2). If a plan administrator fails to furnish a participant with a summary plan description, the participant may request one, *id.* § 1024(b)(4), and must allow the administrator 30 days to comply with that request before turning to the courts, *id.* § 1132(c)(1)(B). With respect to claims that the company and its employees cannot resolve administratively, Congress "provid[ed] for appropriate remedies, sanctions, and ready access to the Federal courts," *id.* § 1001(b), creating four general causes of action in favor of affected participants and beneficiaries. A beneficiary thus may sue (1) "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan," *id.* § 1132(a)(1)(B); (2) to seek equitable relief for any violation of the terms of the plan or subchapter I of Title 18, *id.* § 1132(a)(3); (3) to seek appropriate relief when the administrator breaches his fiduciary duties to the plan, *id.* §§ 1132(a)(2), 1109(a); or (4) to seek money damages for certain violations of ERISA's disclosure requirements, *id.* §§ 1132(a)(1)(A), 1132(c)(1), (3).

B.

Crosby insists that she has not received the "benefits due to [her] under the terms of [the] plan," 29 U.S.C. § 1132(a)(1)(B), because the booklet did not amount to a legitimate summary of material modifications and thus could not legitimately modify the plan. In the alternative, she argues that the enrollment worksheet effectively amended the terms of the booklet. We disagree with both contentions.

As to her first argument, the booklet that Rohm and Haas distributed in the fall of 2000 has all the hallmarks of a legitimate summary of material modifications. *See id.* § 1022(a). It was a single document that purported to explain "a number of changes to your health care and group insurance benefits for 2001," JA 99; it contained "information on the benefits being offered in 2001," JA 100; it was mailed to all salaried employees participating in the plan within "60 days after the date of the adoption of the modification or change," 29 U.S.C. § 1024(b)(1); *see also* 29 C.F.R. § 2520.104b-1(b)(1); and it accurately described the amendments to the plan in language "calculated to be understood by the average plan participant," 29 U.S.C. § 1022(a).

For many of the same reasons that the booklet was a legitimate summary of material modifications, the enrollment worksheet was not a summary of material modifications or for that matter any other comparable formal plan document—which defeats Crosby's second argument. The worksheet, as its name suggests, had none of the features of a plan document. *See* 29 U.S.C. § 1102(b); *see also Brown v. Ampco-Pittsburgh Corp.*, 876 F.2d 546, 551 (6th Cir. 1989). Most notably, it did not purport to summarize any material modifications to the plan. It instead provided a "personalized" estimate of Allred's benefits in 2001, JA 358—an estimate that the company

warned should be "review[ed] . . . for accuracy," JA 100. Although a company normally must send a summary of material modifications to all participants, no one suggests that Allred's enrollment worksheet was sent to anyone but Allred. As such, the worksheet was nothing more than an informal communication between the administrator and one employee, as were the letters that Rohm and Haas sent to Allred between December 2000 and July 2001. Because the worksheet amounted to no more than an informal communication, it could not amend the terms of the plan. *See Sprague*, 133 F.3d at 403; *Flacche*, 958 F.2d at 736 (holding that personalized pension estimates could not amend the clear terms of the summary plan description).

A contrary conclusion—permitting personalized estimates to be cognizable vehicles for amending a plan—would create more problems that it would solve. It would discourage plan participants from relying on a uniform, understandable set of documents to determine their rights and obligations under the plan, as they instead would be tempted to focus only on their own personalized estimates. *Cf. Flacche*, 958 F.2d at 736 (noting that ERISA "creates a strong incentive to write the [summary plan description] carefully, and it gives beneficiaries an understandable document upon which they can rely"). It would lead to a greater number of mistakes in plan amendments as companies could err not just by preparing an incorrect (though readily correctable) single summary of amendments but by miscalculating the serial effects of those amendments for each of their employees. It would lead to great unfairness to participants who receive calculations that mistakenly *underestimate* their benefits. *See Fitch v. Chase Manhattan Bank*, 64 F. Supp. 2d 212, 226 (W.D.N.Y. 1999) ("If the mistake had been in the [plan adminstrator]'s favor, one cannot seriously imagine that the plaintiffs would have accepted the error as being a term of the plan."). And in the end it would discourage plan administrators from offering the personalized estimates of benefits in the first place—which would eliminate a useful tool that customarily will effectively communicate changes to employees so long as they heed the warning to compare their estimate to the formal summary plan description to identify any "errors and omissions." *See Sprague*, 133 F.3d at 403. Even if, in short, we could do some good for Crosby by accepting her argument, we do not think that it is an argument that would advance "the interests of employees generally." *Id.*

Crosby's other, related arguments are unconvincing as well. She submits that the booklet does not meet the requirements of a summary plan description under 29 U.S.C. § 1022(b) and that it therefore should be ignored. But she ignores the fact that ERISA does not require plan administrators to republish the summary plan description every time an amendment is made to the plan; rather, Rohm and Haas properly provided a summary of material modifications to the plan, which it permissibly did in the form of the booklet. *See* 29 U.S.C. §§ 1022(a), 1024(b)(1).

She also submits that the booklet could not be a valid summary of material modifications because it was not "written in a manner calculated to be understood by the average plan participant." 29 U.S.C. § 1022(a). As she sees it, the booklet was confusing because the attached personalized worksheet contained several errors. But that is simply another way of saying that any mistake, whether in the summary or not, precludes the summary from satisfying the "understood by the average plan participant" requirement. She has not supplied any authority for that proposition. What is more, the booklet alerted employees of the risk—quite accurately, it turns out—of inaccurate personalized worksheets, advising employees to review the worksheets for "errors or omissions." JA 100. Nothing about this straightforward directive was beyond the ken of the "average plan participant." And nothing about the remedy—encouraging participants "to speak to a representative" should any errors be found—was remotely confusing.

She also submits that Allred never received the booklet, making the plan amendment invalid as to him. *See* 29 U.S.C. § 1024(b)(1) (outlining ERISA's disclosure requirements). But the uncontradicted record shows that the company sent the booklet and the individualized enrollment worksheets to all salaried employees participating in the plan. Because a letter mailed properly "creates a presumption that it reached its destination in usual time and was actually received by the

person to whom it was addressed," *Hagner v. United States*, 285 U.S. 427, 430 (1932), and because Crosby has not rebutted that presumption (but shown only that she could not find the documents in Allred's files a year later), we must assume on this record that Allred received the documents. *See In Re Yoder Co.*, 758 F.2d 1114, 1118 (6th Cir. 1985).

## C.

Crosby further argues that Rohm and Haas should be estopped from refusing to enforce the terms of Allred's enrollment worksheet because, "[h]ad Allred not been mislead, he could have purchased additional insurance[,] . . . a significant 'missed opportunity.'" Br. at 30. To bring a cognizable equitable-estoppel claim, Crosby bears the burden of showing that Rohm and Haas made fraudulent representations to Allred, that Allred did "not know the truth behind [Rohm and Haas's] representations," *Trs. of the Mich. Laborers' Health Care Fund v. Gibbons*, 209 F.3d 587, 591 (6th Cir. 2000), and that Allred detrimentally and justifiably relied on Rohm and Haas's representations, *see Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1298 (6th Cir. 1991). *Cf. Sprague*, 133 F.3d at 403 ("Altering a welfare plan on the basis of non-plan documents and communications, absent a particularized showing of conduct tantamount to fraud, would undermine ERISA.") (internal quotation marks omitted).

Crosby cannot satisfy these requirements. She, for one, has not shown that Rohm and Haas's inclusion of an incorrect enrollment worksheet "contain[ed] an element of fraud, either intended deception or such gross negligence as to amount to constructive fraud." *Mich. Laborers' Health Care Fund*, 209 F.3d at 591 (internal quotation marks and ellipsis omitted). The accompanying booklet advised Allred to check the worksheet for "errors or omissions" and to "speak with a representative" should he find any. JA 100. Far from trying to deceive Allred, these instructions were designed to *prevent* Allred and his fellow employees from relying on the worksheet alone. Nor were the errors the least bit difficult to decipher: What the worksheet seemed to provide—basic life insurance of $10,000 plus three times the employee's base salary and supplemental insurance of 175% of base salary—the booklet specifically precluded by eliminating the $10,000 benefit, by offering basic insurance of just two times the employee's base salary and by permitting supplemental insurance only in 100% increments. The conclusion that Rohm and Haas was not trying to deceive anyone is bolstered by the company's repeated attempts to remedy the error through correspondence in February, April and July of 2001. At most, Crosby has shown that the company made an honest mistake, that in other words it was guilty of misfeasance, not the malfeasance that estoppel requires.

Crosby, for another, cannot establish the "reasonable or justifiable reliance" that the claim requires. *Sprague*, 133 F.3d at 404. A party's reliance "can seldom, if ever, be reasonable or justifiable if it is inconsistent with the clear and unambiguous terms of plan documents available to or furnished to the party." *Id.* Otherwise, we would be permitting estoppel "to override the clear terms of plan documents" and in the end would be permitting the party to "enforce something other than the plan documents themselves," which ERISA prohibits. *Id.* The terms of this plan—the basic life insurance benefit and the supplemental life insurance options—were exceedingly clear, making Allred's alleged reliance on contrary informal communications from the company unreasonable as a matter of law.

## D.

Crosby, lastly, argues that the district court abused its discretion by refusing to assess monetary penalties against Rohm and Haas for failing to respond more promptly to her request for information. ERISA gives district courts "discretion" to impose up to $110 a day in penalties against "[a]ny administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary . . .

by mailing the material requested . . . within 30 days after such request." 29 U.S.C. § 1132(c)(1)(B); *see also* 29 C.F.R. § 2575.502c-1.

The key failing in Crosby's argument is that the statute expressly gives the district court "discretion" to impose this penalty, and she has not shown how a district court would be compelled to impose the sanction on these facts. In denying Crosby's request for a monetary penalty, the district court explained that "Rohm and Haas made a good-faith attempt to comply with [Crosby's] request and its failure to comply . . . did not prejudice [Crosby] in any meaningful way." D. Ct. Op. at 15. Rohm and Haas received Crosby's request only belatedly (because the two letters were sent to the administrator, not the company) and responded 51 days later with a detailed letter, the booklet and the relevant portions of the summary plan description then in effect. Although Crosby had requested other documents as well—such as the plan's insurance policy—she has not shown why the district court was mistaken in finding that the information sent to her "provided [her] with all of the information she needed to assess a possible claim." D. Ct. Op. at 14. When Crosby took the further step of requesting the complete summary plan description from the fall of 2000 (a request that Rohm and Haas promptly satisfied), Crosby did not otherwise indicate that Rohm and Haas's response was inadequate. Because Rohm and Haas had no reason to doubt the sufficiency of its responses, because the delays resulted at most from good-faith mistakes and because Crosby has not pointed to any way in which she was prejudiced by the delays, we have no basis for saying that the district court abused its discretion in declining to assess this penalty.

III.

For these reasons, we affirm.