RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0259p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

ANDRE DESCHAMPS,

              *Plaintiff-Appellee,*

    *v.*

BRIDGESTONE AMERICAS, INC. SALARIED EMPLOYEES RETIREMENT PLAN; BRIDGESTONE AMERICAS HOLDING, INC.; BRIDGESTONE AMERICAS, INC.,

              *Defendants-Appellants.*

No. 15-6112

———————

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:12-cv-00086—Kevin H. Sharp, Chief District Judge.

Argued: July 28, 2016

Decided and Filed: September 12, 2016[*]

Before: SILER, GIBBONS, and COOK; Circuit Judges.

———————

## COUNSEL

**ARGUED:** John E. B. Gerth, WALLER LANSDEN DORTCH & DAVIS, LLP, Nashville, Tennessee, for Appellants. Karla M Campbell, BRANSTETTER, STRANCH & JENNINGS, PLLC, Nashville, Tennessee, for Appellee. **ON BRIEF:** John E. B. Gerth, Robert E. Boston, WALLER LANSDEN DORTCH & DAVIS, LLP, Nashville, Tennessee, for Appellants. Karla M Campbell, R. Jan Jennings, BRANSTETTER, STRANCH & JENNINGS, PLLC, Nashville, Tennessee, for Appellee.

———————

[*]This opinion originally issued as an unpublished opinion filed on September 12, 2016. The court has now designated the opinion as one recommended for full-text publication.

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge.   After working for ten years at a Bridgestone plant in Canada, Andre Deschamps transferred to a Bridgestone facility in the United States. Prior to accepting this position he expressed concern about losing pension credit for his ten years of employment in Canada.   But upon receiving assurances from members of Bridgestone's management team that he would keep his ten years of pension credit, Deschamps accepted the position.   For over a decade, Deschamps received various written materials confirming that his date of service for pension purposes would be August 8, 1983.   He even turned down employment opportunities from a competitor at a higher salary because of the purportedly higher pension benefits he would receive at Bridgestone.   In 2010, Deschamps discovered that Bridgestone had changed his service date to August 1, 1993, the date he began working at the American plant.   After failed attempts to appeal this change through Bridgestone's internal procedures, Deschamps brought a suit against Bridgestone alleging claims of equitable estoppel, breach of fiduciary duty, and an anti-cutback violation of ERISA.[1]   The district court granted summary judgment for Deschamps on these three claims.   For the following reasons, we affirm the district court's judgment.

**I.**

On August 8, 1983, Deschamps began working for Firestone[2] in Canada as a maintenance manager.   **(DE 32-1, Deschamps Dep., Page ID 188–89.)**   In late 1992, Deschamps's plant manager made him aware of a job opportunity at one of Bridgestone's plants in Wilson, North Carolina.   **(*Id.* at 192–93.)**   In early 1993, Deschamps began discussing the prospect of employment at the Wilson plant with George Ruccio,[3] the plant manager.   **(*Id.* at 195.)**   Feeling it was in his best interest to negotiate his benefits during the hiring process,

---

[1]Deschamps also sought reformation of the Plan. Reformation is not an issue on appeal.

[2]Bridgestone acquired Firestone in 1988. **(DE 77, Mem., Page ID 1819.)**

[3]Ruccio was deceased at the time of this litigation. **(DE 32-1, Deschamps Dep., Page ID 218–19.)**

Deschamps recalled discussing with Ruccio his pension benefits.  Specifically, he communicated to his interviewers his concern that his service date for those benefits would be set as August 8, 1983, his start date at the Canadian facility, so he would not lose his pension credit for his ten years of work there.  **(DE 60-1, Deschamps Dep., Page ID 1114–16, 1118.)**  As his pension benefits were a "driving force" in his decision to transfer from Canada, Deschamps raised the issue at his interview, which included Ruccio, Charles Russell, human resources manager, Thomas Berg, director of manufacturing, and Wayne Hunter, plant controller.  Deschamps Dep. 35:12–20, ECF No. 32-1; **(DE 32-1, Deschamps Dep., Page ID 198–99, 201; DE 40, Russell Decl., Page ID 745–46; DE 61, Hunter Decl., Page ID 1392.)**  Deschamps had "full confidence" that these people would give him accurate information about his benefits.  *Id.* at 38:3–20.  A few weeks later, Deschamps testified, Ruccio contacted him to assure him that he would be given pension credit back to August 8, 1983.  (***Id.* at 202.**)  However, Deschamps was not given anything in writing regarding his service date until 1994 when he received his first benefit statement.  **(DE 32-1, Deschamps Dep., Page ID 235; DE 60-1, Deschamps Dep., Page ID 1203–04.)**

Russell "clear[ly] recall[ed]" that upon interviewing for the Wilson plant, Deschamps was concerned about his service date.  Russell Decl. 1, ECF. No. 40.  In response to Deschamps's concerns, Russell reached out to Robert Conger, Bridgestone's pension analyst, whose assistance, Russell testified, was "instrumental" in reaching a decision about Deschamps's pension benefits.  Russell Dep. 18:3–15, ECF No. 70-2.  Russell testified that after Conger confirmed the terms of Deschamps's employment, including crediting his years of employment in Canada for pension purposes, Russell and Ruccio offered Deschamps a position at the Wilson plant, making "specific representations" that his service date would be August 8, 1983.  Russell Decl. 2.  Conger, on the other hand, testified that having been retired for sixteen years, he did not recall any specific conversation with Deschamps or anyone else about Deschamps's pension benefits, but that he is "sure [he] did not tell [Deschamps] or anyone else that [Deschamps] would have any pension credit for his employment in Canada" because he was not authorized to do so.  Conger Decl. 2, ECF No. 71.

Consistent with Russell's testimony, Hunter testified that Ruccio and Russell contacted Bridgestone's corporate office to ensure that Deschamps would be given pension credit for his time in Canada and that, "[w]hen the corporate office approved of the offer to Mr. Deschamps, including the representation that his pension would be calculated using the 1983 date, this information was passed on to Mr. Deschamps." Hunter Decl. 2, ECF No. 61. Likewise, Berg testified that through his "personal[] involve[ment]" in discussions with Deschamps about the terms of his employment, he knows that Deschamps was offered employment "with one of the conditions being that his employment date" for benefits purposes would be August 8, 1983. Berg Decl. 1–2, ECF 63.

During his employment at the Wilson plant, Continental Tire (Continental), a competitor, twice offered Deschamps a position at its facility, once in 2000 and again in 2003. (DE 38-3, Continental Tire Offers, Page ID 634–38, 641–42; DE 60-1, Deschamps Dep., Page ID 1159–60.) Continental offered Deschamps a higher salary, but the pension benefits at Bridgestone far exceeded those at Continental, so Deschamps decided to continue his employ with Bridgestone. (DE 32-1, Deschamps Dep., Page ID 220–21.) His decision was based on the assumption that would receive ten years of service credit for his employment in Canada. (DE 60-1, Deschamps Dep., Page ID 1170–71, 1174.) Deschamps testified that had he known that he would not receive this credit, he "would have more likely moved to . . . Continental." Deschamps Dep. 95:13–96:2. In 2005, Continental froze its pension plans and subsequently shut down most of its operations in 2006, resulting in mass layoffs. (DE 34, Ledsinger Decl., Page ID 400–01.)

Through his years of employment at Bridgestone, Deschamps's belief regarding the service date for his pension benefits was confirmed by written materials like benefit summaries and materials made available online. (DE 60-1, Deschamps Dep., Page ID 1186; DE 60-2, Misc. Pension Docs., Page ID 1252–74.) Many of these documents included a disclaimer warning that the document "is only an estimate of your pension benefits" and that "the Pension Plan Documents govern all benefits." Misc. Pension Docs. 1–2, 4, 6–12, 14–15, ECF No. 60-2. In either 2009 or 2010, Bridgestone investigated and corrected errors in the service dates of various employees who had been employed by Bridgestone abroad and later transferred to a facility in the United States. (DE 33, Phillips Decl. Page ID 345; DE 60-4, Resp. to Pl.'s First Set of

Interrogs., Page ID 1293.)  Around August 2010, Deschamps discovered that his service date had changed from 1983 to 1993, causing him not to receive pension credit for his years of employment in Canada.  (DE 32-1, Deschamps Dep., Page ID 234; DE 60-1, Deschamps Dep., Page ID 1186.)

Dechamps's benefits are governed by the Bridgestone/Firestone, Inc. 1984 Retirement Plan (the Plan).  (DE 38-8, Plan, Page ID 689–741.)  One way that an employee commences participation in the Plan is by completing one year of Eligibility Service, provided that the employee "is a Covered Employee on such date."  Retirement Plan 20, ECF No. 38-8.  According to William Phillips, a member of Bridgestone's pension board, Deschamps's benefits did not begin to accrue until 1993 because it was at that point that he became a covered employee.  (DE 33, Phillips Decl., Page ID 344; DE 38-6, Letters from Bridgestone to Deschamps, Page ID 662–67.)  The Plan defines "covered employee" in terms of five disjunctive classifications.  (DE 38-8, Plan, Page ID 690–91.)  The first two are of particular relevance in this case:

> (10) <u>Covered Employee:</u> An Employee who is described in paragraph (a) of this Subsection . . . .
>
>> (a) An Employee is described in this paragraph if he is:
>>
>>> (i) classified by the Employer as a United States salaried Employee not represented by a designated collective bargaining agent; or
>>>
>>> (ii) a foreman, supervisor, plant protection Employee, administrative or clerical Employee or confidential Employee of the Employer, whether or not paid on an hourly basis, who is not represented by a designated collective bargaining agent . . . .

*Id.* at 2–3.  Bridgestone denied Deschamps's appeal to change his service date to 1983, as well as his subsequent appeal of that decision, reasoning both times that he was not a covered employee under subsection (i).  **(DE 38-6, Letters from Bridgestone to Deschamps, Page ID 662–67.)**

Deschamps then filed a complaint alleging, as relevant here, equitable estoppel pursuant to 29 U.S.C. § 1132(a)(3), breach of fiduciary duty pursuant to 29 U.S.C. § 1104, and an anti-cutback violation pursuant to 29 U.S.C. §1054(g).  **(DE 1, Compl., Page ID 9–14.)**  The parties brought cross-motions for summary judgment.  **(DE 31, 36.)**  On the claims at issue here, the

district court granted Deschamps's motion and denied Bridgestone's motion. **(DE 77, Mem., Page ID 1818, 1843.)**

## II.

Summary judgment is appropriate where the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[4] Fed. R. Civ. P. 56(a). We review a district court's summary judgment order *de novo*, viewing all reasonable facts, evidence, and inferences in favor of the nonmoving party. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014).

## III.

Our precedent permits a claim for equitable estoppel arising out of a pension plan where a plaintiff can establish the following elements:

> (1) conduct or language amounting to a representation of material fact; (2) awareness of the true facts by the party to be estopped; (3) an intention on the part of the party to be estopped that the representation be acted on, or conduct toward the party asserting the estoppel such that the latter has a right to believe that the former's conduct is so intended; (4) unawareness of the true facts by the party asserting the estoppel; and (5) detrimental and justifiable reliance by the party asserting estoppel on the representation.

*Bloemker v. Laborers' Local 265 Pension Fund*, 605 F.3d 436, 442 (6th Cir. 2010). In the case of an unambiguous pension plan, the plaintiff must also prove three additional elements: "[(6)] a written representation; [(7)] plan provisions which, although unambiguous, did not allow for individual calculation of benefits; and [(8)] extraordinary circumstances in which the balance of equities strongly favors the application of estoppel." *Stark v. Mars, Inc.*, 518 F. App'x 477, 481 (6th Cir. 2013) (alterations in original) (quoting *Bloemker*, 605 F.3d at 444). Thus, our first inquiry is whether the Plan provision at issue is ambiguous.

---

[4]Bridgestone repeatedly insists that there are material disputed facts, but simply points to undisputed facts and disputes whether application of these facts supports Deschamps's claims. *See, e.g.,* Reply Br. 5, R. 21 ("These *uncontested* facts *at the very least* create a material dispute of fact as to whether Deschamps suffered any detriment . . . .") (first emphasis added).) This is insufficient to preclude a grant of summary judgment in Deschamps's favor. The material facts here are not in dispute.

**A.**

The Plan plainly provides that Deschamps can be classified as a covered employee if he falls under any one of five conditions, as highlighted by the use of the disjunctive term "or." Bridgestone insists that Deschamps can only possibly be a "United States salaried Employee," but does not attempt to explain why he cannot be classified under any of the other four conditions. This interpretation is simply untenable. Subsection (ii) applies to a "foreman" or "supervisor," either of which seems to encompass Deschamps's position as a maintenance manager. However, we cannot say so with certainty because the Plan does not define these terms. In ordinary parlance, "manager" and "supervisor" are often used interchangeably,[5] so if Bridgestone's definition of "supervisor" excludes managers, those terms are ambiguous.

Because the Plan is ambiguous, we need not analyze the three elements under the heightened standard. And because Bridgestone only contests that elements two and five are met, we will only consider those two elements.

**B.**

To meet the second element of equitable estoppel, Deschamps must establish that Bridgestone was aware of the "true facts." *See Bloemker*, 605 F.3d at 442. We have interpreted this element as requiring the plaintiff to demonstrate "either intended deception or such gross negligence as to amount to constructive fraud." *Paul v. Detroit Edison Co. & Mich. Consol. Gas Co. Pension Plan*, No. 15-1493, 2016 WL 808105, at *5 (6th Cir. Mar. 2, 2016) (quoting *Bloemker*, 605 F.3d at 443). Here, the parties dispute whether Bridgestone committed such gross negligence as to constitute constructive fraud.[6] "A reasonable factfinder," Bridgestone contends, "could conclude on th[e] record that Deschamps did not make any inquiries to individuals with

---

[5]Black's Law Dictionary, for example, defines "manager" as "[s]omeone who administers or *supervises* the affairs of a business, office, or other organization." *Manager*, BLACK'S LAW DICTIONARY (10th ed. 2014) (emphasis added). It defines "supervisor" as "[o]ne having authority over others; *a manager* or overseer." *Supervisor*, BLACK'S LAW DICTIONARY (10th ed. 2014) (emphasis added).

[6]Bridgestone's argument that we must consider whether it was actually aware, **(Reply Br. at 7–8)**, is invalid in light of the fact that this element has been interpreted broadly to allow for relief when plaintiffs show mere gross negligence.

authority[7] to administer or interpret the . . . Plan or to advise employees of their pension benefits or service credit eligibility." Appellant Br. 30, R. 18.

An examination of the cases analyzing this element helps to illustrate the type of conduct that a plaintiff must present to establish the requisite gross negligence. In our recent decision, *Paul*, for example, the employer and the pension plan concluded that the plaintiff's benefit was improperly calculated, but only two years "after giving repeated written and oral assurances to [the plaintiff] that his retirement benefit was properly calculated." 2016 WL 808105, at *2, *5. We concluded that this "gross miscalculation" amounted to constructive fraud because "[the defendants] were the only ones in a position to know the true facts, they assumed that they knew the true facts, they failed to ascertain the true facts when [the plaintiff] specifically asked if the calculations were correct, and they repeatedly assured [the plaintiff] that they knew the true facts." *Id.* at *5. This was true even though the "Pension Calculation Statement" contained a disclaimer granting the employer the right to correct any errors and providing that the benefit defined in the plan would prevail in the event of a conflict with the statement. *Id.* at *1. Similarly, *Smiljanich v. General Motors Corp.* involved an employee who, after leaving his employer for approximately two years, was rehired with the promise that upon his return, he would be classified as a "bridged employee," meaning that he would not lose his accrued service time. 302 F. App'x 443, 446–47 (6th Cir. 2008). About two years later however, the employer determined that he should not be bridged. *Id.* at 447. We found the employer's actions to constitute gross negligence because the employer represented to him that he would be bridged, it "understood" that he was not in fact bridged, but failed to notify the plaintiff of this fact, "even in the face of persistent inquiries by" the plaintiff. *Id.* at 449.

Conversely, in *Crosby v. Rohm & Haas Co.* we found that the employer did not commit gross negligence. 480 F.3d 423, 431 (6th Cir. 2007). There, the employer sent the employee a booklet noting changes in employees' life insurance benefits. *Id.* at 426. Attached with the booklet was a worksheet, which purported to list the employee's benefits, but the benefits listed were actually erroneous. *Id.* Several times in the ensuing months, the employer attempted to

---

[7]Bridgestone does not cite any law for the proposition that authority is required, but to the extent it is, for the reasons discussed below, those making the misrepresentations to Deschamps had apparent authority to do so.

correct the errors. *Id.* at 426–27, 431. Moreover, not only did the booklet warn employees to check for errors, but the errors were not "the least bit difficult to decipher," as the booklet explicitly precluded the benefits that the worksheet professed to provide. *Id.* at 431. Therefore, we concluded that the employer made an "honest mistake," and was at most "guilty of misfeasance, not the malfeasance that estoppel requires." *Id.*; *see also Stark*, 518 F. App'x at 481–82) (concluding that the employer made an "honest mistake" and was not grossly negligent where it properly investigated the plaintiff's concern about her benefits calculation, even though the calculation ultimately proved erroneous).

Here, it is apparent from the record that even prior to being hired at the American facility, Deschamps was concerned about losing the pension credit he acquired during his years of employment at the Canadian facility. All those currently living who interviewed Deschamps recalled him inquiring with them about his pension benefits. And according to Russell, Deschamps's employment offer was made with the express representation that his service date would be August 8, 1983. Deschamps had no reason to believe that this statement was inaccurate, particularly in light of the fact that it was repeated for more than a decade in benefits summaries and online materials. Unlike the plaintiffs in *Crosby*, though Deschamps had access to the Plan document, it was more than a bit difficult to decipher because, as discussed above, Bridgestone apparently defined "supervisor" contrary to the ordinary meaning of the term, without attempting to inform plan participants of this fact by providing a definition. And in contrast to the actions of the defendant in *Crosby*, Bridgestone did not quickly attempt to correct the error, but let the misrepresentation stand for sixteen or seventeen years. Though the Plan contained a disclaimer, only Bridgestone, like the defendants in *Paul* and *Smiljanich*, was in a position to know the true facts—the unusual definition of "supervisor" that excludes managers— and it failed to notify Deschamps of this fact, despite his repeated initial inquiries about his pension. Consequently, Bridgestone's actions constituted such gross negligence as to amount to constructive fraud.

**C.**

Bridgestone next asserts that Deschamps "almost surely would have been economically *worse off* had he accepted a Continental job offer" due to Continental's layoffs and freezing of its pension plan, so Deschamps cannot establish detrimental reliance. Appellant Br. 33, R. 18.

To show detrimental reliance, Deschamps must establish that Bridgestone's statements "in truth" influenced his conduct, causing prejudice. *CIGNA Corp. v. Amara*, 563 U.S. 421, 443 (2011). The prejudice, or detriment, suffered must be "actual and substantial," but may be proved by "loss of opportunity to improve one's position." *Smiljanich*, 302 F. App'x at 450. In *Smiljanich*, the plaintiff applied to be rehired by his former employer, General Motors (GM), at the same time another employer, Rassini Corp., was recruiting him. *Id.* at 446. Though Rassini did not offer the same retirement benefits as GM, it was prepared to offer the plaintiff a supplemented salary to allow him to receive similar total benefits. *Id.* This offer notwithstanding, the plaintiff decided to return to GM based on its false representations that his accrued service time would be bridged. *Id.* We concluded that the plaintiff suffered detriment because, although the benefits at Rassini did not "precisely mirror[]" those at GM, the evidence "indicate[d] that Rassini was prepared to offer a salary which reasonably approximated the total compensation (salary and benefits) of full retirement at GM." *Id.* at 450–51; *see also Pell v. E.I. DuPont de Nemours & Co., Inc.*, 539 F.3d 292, 303 (3d Cir. 2008) (concluding that the plaintiff suffered detriment where he testified that had his employer not miscalculated his pension benefits, "he would have explored whether he could return to [his former employer], get another job with a better pension, or retire sooner and start a consulting business") (cited with approval in *Bloemker*, 605 F.3d at 441–42).

Here, Deschamps suffered the loss of an employment opportunity at Continental, which offered Deschamps a more competitive salary than he was receiving at Bridgestone. He testified that had Bridgestone not misrepresented to him his service date, he would have likely moved to Continental. Bridgestone's insistence that Deschamps would have been economically worse off at Continental is problematic for several reasons. For one, we cannot definitively conclude that Deschamps would have been worse of at Continental; he very well could have been one of the few who were not laid off. Moreover, Bridgestone does not cite, nor have we found, any

authority requiring the detriment suffered to be economic. To the contrary, our precedent requires a "loss of *opportunity* to improve one's position." *See Smiljanich*, 302 F. App'x at 450 (emphasis added); *see also Pell*, 539 F.3d at 303 (concluding the plaintiff suffered detriment because he "would have *explored*" other opportunities (emphasis added)). Deschamps lost that when he twice declined an offer to earn a higher salary at Continental. Moreover, Deschamps's reliance was reasonable considering that the representations about his pension credit were made by members of Bridgestone's management and confirmed in written materials and online for well over a decade. *See Bloemker*, 605 F.3d at 442 ("[The plaintiff's] reliance on [the misrepresentations concerning his service date] was reasonable, particularly in light of an email from [the employer's] pre-retirement counselor who, in response to a direct question from [the plaintiff], stated that his beginning service date was 1971.").

Therefore, the district court did not err in granting summary judgment to Deschamps on his equitable estoppel claim.

### IV.

We turn now to Deschamps's breach of fiduciary duty claim. To establish a breach of this duty, Deschamps must show that (1) Bridgestone acted in a fiduciary capacity in making misrepresentations to Deschamps, (2) those misrepresentations were material, and (3) Deschamps detrimentally relied on the misrepresentations. *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 449 (6th Cir. 2002). The second element is not disputed.

### A.

ERISA imposes on fiduciaries the obligation to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). However, at dispute in this case is not whether Bridgestone[8] breached its fiduciary duties,[9] but whether it is

---

[8]Bridgestone, not any individual employee, is named in the complaint, so our inquiry is whether Bridgestone acted as a fiduciary.

a fiduciary. A fiduciary is defined by ERISA to include a corporation[10] who "exercises any discretionary authority or discretionary control respecting management of [a] plan" or "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). In determining whether a corporation is a fiduciary, rather than looking to the formal title, we use a functional approach, looking to whether it acts in a fiduciary capacity with respect to the conduct at issue. *Briscoe v. Fine*, 444 F.3d 478, 486 (6th Cir. 2006). In *Varity Corp. v. Howe* for instance, the Supreme Court looked to common law, including the law of trusts and agency, to ascertain what actions constitute plan administration so as to make one a fiduciary. 516 U.S. 489, 502–03 (1996). It concluded that the discretionary act of plan administration "includes the activities that are 'ordinary and natural means' of achieving the 'objective' of the plan," such as offering information about the meaning of the plan's terms or "[c]onveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation." *Id.* at 502–04. Based on this definition, the employer acted in a fiduciary capacity when it falsely represented to its employees that their benefits would remain the same if they voluntarily transferred to a separately incorporated subsidiary, knowing that the subsidiary was in fact insolvent, which caused employees to lose their non-pension benefits. *Id.* at 494, 498–503. Accordingly, an employer may "act[] in a fiduciary capacity when making misrepresentations to its employees about their benefit plan." *Sprague v. General Motors Corp.*, 133 F.3d 388, 404 (6th Cir. 1998) (citing *Varity*, 516 U.S. at 497–504); *accord In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 579 F.3d 220, 230 (3d Cir. 2009) ("[A]n employer 'acts as a fiduciary when explaining plan benefits . . . to its employees." (citations omitted)); *Matthews v. Chevron Corp.*, 362 F.3d 1172, 1178–79 (9th Cir. 2004) (concluding that the employer acted in its fiduciary capacity when it discussed with employees the likelihood of its adopting a severance package, with the purpose of helping employees make informed choices about their plan options). However, a person who makes a business decision, such as reducing the amount of unaccrued plan benefits or

---

[9]It is well established that misrepresenting a participant's pension benefits breaches a fiduciary duty, and Bridgestone does not argue to the contrary. *See, e.g., Berlin v. Mich. Bell Tel. Co.*, 858 F.2d 1154, 1163 (6th Cir. 1988).

[10]The definition of "fiduciary" refers to a "person," but "person" is defined to include a corporation. 29 U.S.C. §§ 1002(9), (21)(A).

terminating a pension plan, that happens to have a collateral effect on employee benefits does not act in a fiduciary capacity. *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 718 (6th Cir. 2000); *Berlin*, 858 F.2d at 1163. Likewise, "purely ministerial functions such as processing claims, applying plan eligibility rules, communicating with employees, and calculating benefits," are not fiduciary functions. *Pipefitters Local 636 v. Blue Cross & Blue Shield of Mich.*, 213 F. App'x 473, 477 (6th Cir. 2007) (quoting *Baxter v. C.A. Muer Corp.*, 941 F.2d 451, 455 (6th Cir. 1991)).

In response to a direct inquiry from Deschamps, Bridgestone, through its agents Russell and Ruccio, confirmed that Deschamps's service date would be August 8, 1983, allowing him to receive pension credit for his years of employment at Bridgestone. This act was a discretionary one within the meaning of ERISA because it involved conveying information about the Plan's terms and the likely benefits that Deschamps would receive in the future, thus purportedly allowing him to make an informed choice about his continued participation in the Plan. Thus, Bridgestone acted as a fiduciary.

**i.**

That Bridgestone acted in a fiduciary capacity does not end our inquiry because a corporation does not act on its own, but through its agents. The district court determined that those making misrepresentations to Deschamps concerning his pension benefits had apparent authority, but Bridgestone seemingly disputes the applicability of the principles of apparent authority to the facts of this case.

We have applied agency principles, including those related to apparent authority, in resolving claims under ERISA. In *Richards v. General Motors Corp.*, for instance, the plaintiff was discharged after improperly "back-dat[ing] quarterly stock transfers and purchases under GM's employee savings plan." 991 F.2d 1227, 1229 (6th Cir. 1993). He alleged, however, that the plan administrator authorized him to use this procedure. *Id.* at 1229, 1232. We turned to agency law to determine whether the administrator, who was not in fact authorized, acted with apparent authority such that the employer would nevertheless be liable for his actions. *Id.* at 1232; *see also James*, 305 F.3d at 455–56 (concluding that the employer breached its fiduciary duties when its human resources representative and plant manager made material

misrepresentations to employees concerning their retirement benefits); *Anderson v. Int'l Union, United Plant Guard Workers of Am.*, 150 F.3d 590, 592–93 (6th Cir. 1998) (applying agency principles to an ERISA claim). Several of our sister circuits have also looked to agency law in resolving ERISA claims. *See, e.g., Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 591 (7th Cir. 2000) ("[I]f the written materials [are] inadequate, then the fiduciaries themselves must be held responsible for the failure to provide complete and correct material information in the event that a *nonfiduciary agent* provides misleading information." (second alteration in original) (emphasis added) (citation omitted)); *Taylor v. Peoples Nat. Gas Co.*, 49 F.3d 982, 988 (3d Cir. 1995) ("[A] plan administrator violates its 'fiduciary obligation owed to the plan participants' when 'those employees on whom plan participants reasonably rely for important information and guidance about retirement' make material misstatements regarding possible changes to a company's pension plan." (citation omitted)); *Kral, Inc. v. Sw. Life Ins. Co.*, 999 F.2d 101, 103–05 (5th Cir. 1993) (turning to agency law to determine whether the employer clothed the agent with apparent authority so as to make the employer liable for the agent's actions). Accordingly, the district court did not err in considering the agency principle of apparent authority.

Apparent authority exists when (1) the principal manifests that another is the principal's agent, and (2) it is reasonable for a third person dealing with the agent to believe the agent is authorized to act for the principal. *Anderson*, 150 F.3d at 593. Ruccio and Russell were both actively involved in attempting to verify Deschamps's pension credits. Ruccio was the manager of the Wilson plant, authorized to oversee a $300 million budget as well as a 2,000-employee workforce. **(DE 77, Mem. Page ID 1832.)** In Russell's capacity as a human resources manager, he was authorized to discuss terms and conditions of candidates for employment at the Wilson plant. **(DE 40, Russell Decl., Page ID 745.)** Bridgestone clothed these two members of management with extensive authority over hiring, including the discussion of terms and conditions of employment. It was reasonable for Deschamps to believe they had authority to make these representations regarding his pension benefits as underscored by the fact that Deschamps was aware that the interviewers took the time to verify this information with corporate-level employees. **(DE 32-1, Deschamps Decl., Page ID 201–03.)**

In sum, Bridgestone acted as a fiduciary when it, through its agents with apparent authority, misrepresented to Deschamps the status of his pension benefits.

**B.**

For the reasons discussed above, Deschamps reasonably relied on Bridgestone's misrepresentations to his detriment. And because Bridgestone acted in its fiduciary capacity in misrepresenting Deschamps's pension benefits, the district court did not err in granting summary judgment for Deschamps on his breach of fiduciary duty claim.

**V.**

Finally, we examine Deschamps's anti-cutback claim. Bridgestone argues that the district court erroneously presumed that Bridgestone previously interpreted the Plan to classify Deschamps as a covered employee. **(Appellant Br. at 42.)** But, reasons Bridgestone, that conclusion is belied by the record because Phillips, who served on the pension board, testified that to be a covered employee, an employee has to be classified as a "United States salaried employee" and Deschamps is not. (***Id.* at 43.**) Thus, it concludes, there is no accrued benefit to be decreased; Bridgestone merely corrected a clerical error. (***Id.* at 46.**)

ERISA prohibits plan amendments that decrease a participant's accrued benefits, with two exceptions that do not apply here. 29 U.S.C. § 1054(g). At issue is whether we look to the text of the Plan or the administrator's interpretation of the Plan in determining if Deschamps accrued a benefit prior to 1993. The circular definition of accrued benefit—"the individual's accrued benefit determined under the plan," 29 U.S.C. § 1002(23)(A)—is not particularly helpful to this analysis. Faced with the lack of guidance from ERISA on the issue, the Supreme Court in *Central Laborers' Pension Fund v. Heinz*, looked to the "terms" of the plan under which the plaintiff accrued benefits, concluding that the "change of *terms*" reduced his promised benefits and that the plaintiff acted "reasonabl[y] if he relied on those *terms* in planning his retirement." 541 U.S. 739, 744–45 (2004) (emphasis added). In the same vein, we postulated that rather than give a comprehensive definition of "accrued benefits," Congress chose to leave the responsibility of delineating the bounds of the term to "the employer and the employee through the agreed-upon *terms* of the plan document." *Thornton v. Graphic Commc'n Conference of the Int'l Bhd of*

*Teamsters Supplemental Ret. & Disability Fund*, 566 F.3d 597, 608 (6th Cir. 2009) (emphasis added). We also reasoned that "Congress's stated motivations for enacting ERISA, particularly the anti-cutback rule, corroborate our conclusion that what amounts to an 'accrued benefit' depends strictly on the *terms* of the pension plan(s) in effect while the employee was engaged in covered employment." *Id.* at 606 (emphasis added). Consequently, we must look to the terms of the Plan in ascertaining which, if any, benefits Deschamps accrued prior to the amendment.

The cases relied on by Bridgestone do nothing to bolster its suggestion that Deschamps can accrue benefits under the plan only if it is interpreted by a plan administrator to allow for such benefits, (*see* Appellant Br. at 42–45); in fact, they undermine its argument. For instance, in *Hunter*, to determine whether plaintiffs had a right to a lump sum distribution of their accounts under their pre-amendment ERISA plans, we looked to rules of contract interpretation. 220 F.3d at 712. We discussed, at length, the relevant provisions of the plan in reaching our conclusion that the plaintiffs' anti-cutback claim failed. *Id.* 712–17. In another case Bridgestone relies on, the plaintiffs, at the time the defendant announced a new interpretation of the plan, were "being paid pension benefits in accordance with the Plan as it was construed at the time of his or her retirement." *Redd v. Bhd. of Maint. of Way Emps.' Div. of Int'l Bhd of Teamsters*, No. 08-11457, 2010 WL 1286653, at *8 (E.D. Mich. Mar. 31, 2010). The court held that a plan administrator's "reinterpretation" of the plan constitutes an amendment for purposes of the anti-cutback rule to the same extent that a customary amendment would. *Id.* This is far from holding that we should look only to a plan administrator's post-hoc interpretation of whether a participant accrued benefits under the pre-amendment plan. To be sure, *Redd* further concluded that to succeed on a claim, plaintiffs must establish that the benefits they received prior to the amendment were based on a "tenable" or "permissible reading of the terms of the Plan." *Id.* at *9–10. Based on the foregoing, rather than solely relying on Phillips's current interpretation, we will look to the text of the Plan to decide whether the interpretation that Deschamps accrued benefits as a covered employee prior to 1993 is plausible.

As discussed above, the text of the Plan is at worst ambiguous, but at best, favors Deschamps's argument that he was a covered employee in 1983 under the classification of "supervisor." It is not untenable that Deschamps, in his capacity as a maintenance manager, was

a supervisor under the language of the Plan. Further, it is undisputed that as a result of the change in the interpretation of this provision that excluded foreign employees from being classified as covered employees, Deschamps's benefits were decreased. Therefore, Deschamps has established an anti-cutback violation and the district court did not err in granting summary judgment in his favor on this claim.

## VI.

We affirm the grant of summary judgment in Deschamps's favor on his equitable estoppel, breach of fiduciary duty, and anti-cutback claims, and remand for further proceedings as may be appropriate.